[L.A. No. 31751. Oct. 1, 1984.]

MARION E. GUBLER, a Judge of the Municipal Court, Petitioner, v. COMMISSION ON JUDICIAL PERFORMANCE, Respondent.

### COUNSEL

Gibson, Dunn & Crutcher, Richard Chernick, John E. Burns and Charles J. Stevens for Petitioner.

John H. Larson, County Counsel (Los Angeles), Donald K. Byrne, Chief Deputy County Counsel, Robert C. Lynch, Assistant Chief Deputy County Counsel, Gary M. Crane, Latham & Watkins, Boyd J. Black, Argue, Freston, Pearson, Harbison & Myers and Lew W. Cramer as Amici Curiae on behalf of Petitioner.

John K. Van de Kamp, Attorney General, S. Clark Moore, Assistant Attorney General, Gary R. Hahn and Robert R. Anderson, Deputy Attorneys General, for Respondent.

### OPINION

**THE COURT.**\*—On petition of Judge Marion E. Gubler of the Municipal Court for the Burbank Judicial District of Los Angeles County, we review a recommendation of the Commission on Judicial Performance that he be publicly censured for "wilful misconduct in office" and "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." (hereinafter wilful misconduct and conduct prejudicial) (Const., art. VI, § 18, subd. (c) set out at fn. 8, *post*). We adopt the commission's

---

\*Before Bird, C. J., Mosk, J., Kaus, J., Reynoso, J., Grodin, J., Sapunor, J.,† and Darrah, J.†

†Assigned by the Chairperson of the Judicial Council.

recommendation and findings, though we conclude that some of petitioner's acts that the commission deemed wilful misconduct amounted only to conduct prejudicial.

Most of the charges against petitioner relate to his zealous efforts to obtain payment from criminal defendants to the county for the cost of the legal representation provided them by the public defender. Other charges arise out of petitioner's orders authorizing private sales of guns to peace officers by defendants whose convictions had subjected the guns to confiscation, destruction, or public auction by the police department.

Hearings were held in November and December 1982 before three special masters, who made findings of fact and conclusions of law. (See Cal. Rules of Court, rule 907 et seq.) As to some charges, the masters concluded that no ground for discipline had been established, and as to others, they concluded that petitioner had engaged in conduct prejudicial.

The commission dismissed some of the charges that the masters had deemed unproved, but otherwise adopted substantially all the masters' findings adverse to petitioner and concluded that most of them established wilful misconduct while the rest showed conduct prejudicial. The commission voted six to three to recommend that petitioner be publicly censured; the three dissenters favored private admonishment.

■ This court is concerned only with the charges the commission sustained and with what discipline, if any, should be imposed. (*Spruance* v. *Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 784, fn. 5 [119 Cal.Rptr. 841, 532 P.2d 1209].) We must determine from our independent evaluation of the record whether the findings against petitioner are supported by clear and convincing evidence and must make our own conclusions of law and determination as to discipline. (*Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 275-276 [110 Cal.Rptr. 201, 515 P.2d 1].) The commission's findings are consistent with, and generally similar to, findings of the masters, who, however, made additional findings, mostly exculpatory in nature, that were neither adopted nor rejected by the commission. We give special weight to the masters' findings that reflect their evaluation of the credibility of witnesses who testified before them. (*Wenger* v. *Commission on Judicial Performance* (1981) 29 Cal.3d 615, 623 [175 Cal.Rptr. 420, 630 P.2d 954].)

ATTORNEY FEES COLLECTION PRACTICES

■ Many of the commission's findings deal with improprieties in petitioner's efforts to enforce orders for payment by defendants to the county

for the costs of the public defender's legal services. Those orders were made pursuant to Penal Code section 987.8, which provides that if, at the conclusion of a criminal proceeding in a trial court, the court determines that a defendant who was represented by the public defender or a court-appointed attorney has the ability to pay all or part of the cost of counsel, the court shall "order the defendant to pay that sum to the county in the manner in which the court believes reasonable and compatible with the defendant's financial ability. Execution may be issued on the order in the same manner as on a judgment in a civil action. The order . . . shall not be enforced by contempt."[1]

---

[1]All section references are to the Penal Code unless otherwise indicated. During the events described in the commission's findings, and at the time of the hearings before the masters, section 987.8 provided as follows (see Stats. 1978, ch. 1134, § 1):

"(a) In any case in which a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court, the court may, after a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof. The court may, in its discretion, hold one such additional hearing within six months of the conclusion of the criminal proceedings. The court may, in its discretion, order the defendant to appear before a county officer designated by the court to make an inquiry into the ability of the defendant to pay all or a portion of the legal assistance provided. At a hearing, the defendant shall be entitled to have, but shall not be limited to, the opportunity to be heard in person, to present witnesses and other documentary evidence, and to confront and cross-examine adverse witnesses; disclosure of the evidence against the defendant, and a written statement of the findings of the court. If the court determines that the defendant has the present ability to pay all or part of the cost, the court shall set the amount to be reimbursed and order the defendant to pay that sum to the county in the manner in which the court believes reasonable and compatible with the defendant's financial ability. Execution may be issued on the order in the same manner as on a judgment in a civil action. The order to pay all or part of the costs shall not be enforced by contempt.

"(b) Prior to the furnishing of counsel or legal assistance by the court, the court shall give notice to the defendant that upon the conclusion of the criminal proceedings in the trial court, the court may, after a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost of counsel. The court shall also give notice that, if the court determines that the defendant has such present ability, the court shall order him to pay all or part of such cost. The notice shall inform the defendant that the order shall have the same force and effect as a judgment in a civil action and shall be subject to execution.

"(c) Definitions: (1) The term 'legal assistance provided' means legal counsel and supportive services including, but not limited to, medical and psychiatric examinations, investigative services, expert testimony and any other form of services provided to assist the defendant in the preparation and presentation of the defendant's case.

"(2) The term 'ability to pay' means the overall capability of the defendant to reimburse the costs, or a portion of the costs, of the legal assistance provided, and shall include, but not be limited to the defendant's: (i) Present financial position;

"(ii) Reasonably discernible future financial position. In no event shall the court consider a period of more than six months from the date of the hearing for purposes of determining reasonably discernible future financial position. Unless the court finds unusual circumstances, a defendant sentenced to state prison shall be determined not to have a reasonably discernible future financial ability to reimburse the costs of his defense;

"(iii) Likelihood that the defendant shall be able to obtain employment within a six month period from the date of the hearing;

"(iv) Any other factor or factors which may bear upon the defendant's financial capability

*Making Attorney Fees Payable Before Fines*

The commission found: In cases where both a fine was levied and an attorney fee order was imposed under section 987.8, and payment was postponed, petitioner's usual practice was to make the fee payable before the fine. The findings describe 29 cases between June 1979 and December 1980 in which petitioner made such orders. Most of the ordered fees were for $50 or $100; the fines were greater. The commission further found that the order of payment was not set at the request or with the consent of the defendant, that payments were routinely applied first to fees, leaving defendants subject to further proceedings with respect to fines, and that the order of payment might present an unreasonable obstacle to satisfaction of the fine where the defendant was unable to pay both fee and fine.

These findings are supported by clear and convincing evidence. The 29 described cases are documented by copies of court docket sheets, introduced as exhibits. A deputy public defender testified that between May and August 1979, petitioner ordinarily made the fee payable before the fine. Another deputy testified that from May 1979 to January 1980, petitioner would make the fee payable either at the same time as or before the fine; thereafter to February 1981 petitioner would require that the fee be paid first. A witness who had served as petitioner's courtroom clerk during 1979 and 1980 could recall cases in which petitioner ordered fees paid before fines but not vice versa; his "guess" was that it went both ways.

Deputy public defenders and the courtroom clerk testified that the proceedings by which petitioner set attorney fees were very short and that petitioner generally would tell the defendant little more than the amount of the fee and when it was payable. The exhibits include at least five cases in which, after payment of fees, the subsequently payable fines became delinquent, and sanctions (e.g., revocation of probation, issuance of bench warrant) were imposed for that and other delinquencies. The masters found, however, that there was no instance in evidence of incarceration for failure to pay a fine because of prior use of funds to pay fees ordered; this was due in part to a liberal continuance policy and a community service option with respect to fine obligations.

Petitioner testified it was not his general policy to require attorney fees to be paid before the fine and suggested, in testimony and in his briefs, that

---

to reimburse the county for the costs of the legal assistance provided.

"(d) At any time during the pendency of the judgment rendered according to the terms of this section, a defendant against whom a judgment has been rendered may petition the rendering court to modify or vacate its previous judgment on the grounds of a change in circumstances with regard to the defendant's ability to pay the judgment. The court shall advise the defendant of this right at the time of rendering the judgment."

the exhibits introduced against him selectively omitted cases in which he ordered the fines paid first. But he introduced no evidence of such cases. He also testified that he always consulted defendants about the due dates for fines and fees and followed their suggestions if within reason.

■ Petitioner also argues that his orders for payment of fees ahead of fines were within the broad authority given him by section 987.8, subdivision (a), to order payment of legal costs "in the manner in which the court believes reasonable and compatible with the defendant's financial ability." The Attorney General (representing the commission) replies, and we agree, that orders which otherwise would have been within petitioner's statutory discretion became an abuse of that discretion when used to prolong the availability of sanctions for nonpayment of fines and create the impression that such sanctions could also be imposed for nonpayment of fees.

As will be explained, the practice of making fees payable ahead of fines was only one among several improper means employed by petitioner to enforce attorney fee orders. That pattern of conduct, together with the weight given the masters' resolution of credibility issues, reinforces our determination that petitioner in fact engaged in the practice in question.

*Ordering Appearances for Fee-Collecting Purposes*

The commission found that petitioner established a practice of "unlawfully ordering repeated appearances for the sole purpose of collection of fee orders."

Petitioner testified as follows: He felt "some obligation," though not the "exclusive duty," to collect attorney fees assessed under section 987.8, but he had few available means of collection other than "[continuing] the case until [the defendant] was able to pay" or "continuing it and asking him if he needed more time." The form provided by the county's bureau of resources and collections "had no place on the form that said that you are ordered to return. So, we had a little stamp that said that the defendant is ordered to return, that we would stamp on there, and that is the only way that we could continue any control over the situation at all was to just have him come back within a reasonable period of time and ask him if he had paid it." The defendant would be "ordered by the court to come back on a particular date because it's necessary in order to resolve the case to ask him some questions about his ability: Why haven't you paid this thing? Are you still unemployed? Do you need more time? Would you like to do it some different way? Would you like to do community service? Somewhere along the line you find out that you can't do some of these things, then you refer it to the Department of Collections, and let them take care of it." "And

there were occasions when people came back two or three times and didn't pay, or hadn't paid, when I do recall that we referred it to the Bureau of Resources and Collections at that time, and it hadn't been referred prior." If the defendant failed to appear as ordered, a bench warrant for his arrest would be issued, as in the case of a witness who disobeys an order to appear.

██ This testimony is clear and convincing evidence that petitioner unlawfully ordered appearances for purposes of collection. Section 987.8 does not authorize issuance of orders in the criminal proceeding to return to court for that purpose. Even on the issue of ability to pay, a court that has initially determined that issue is limited to ordering one additional hearing before the court within six months plus an appearance before a designated county officer. Petitioner recognizes that the statute expressly forbids enforcement of fee orders by contempt, but his use of bench warrants to compel appearances for interrogation on why the defendant has not paid (as distinct from investigation of ability to pay) amounted to using the threat of incarceration for collection purposes.[2]

*Mervin Anderson Incident*

The commission found: On December 11, 1979, Judge Kaufman ordered defendant Mervin Anderson to pay a fine of $65 and an attorney fee of $25 by January 14, 1980. On January 15, the clerk refused to accept Anderson's check for $65 in payment of the fine only. Anderson consulted his assigned public defender, Edward Van Gelder, who advised Anderson to write "fine only" on the check and retender it to the clerk, and further advised the clerk that the check should be accepted. The clerk accepted the check, credited it to the fine, and reported the matter to petitioner the next day, January 16. On January 16, petitioner who was angry at what he believed was public defender interference with enforcement of attorney fee orders, had a conversation with Van Gelder on the subject. He told Van Gelder that Judge Kaufman's fee order was wholly insufficient, that Anderson was ordered to pay the $25 fee on or before a continued hearing date of February 6, 1980, and that if he neither paid nor appeared, a bench warrant would issue for his arrest and he would be assessed fees of $200 or $250. A written order was made on the docket: "Continued to 2-7-80 at 2:00 p.m. for payment

---

[2]In addition to petitioner, there was one other judge and a commissioner on the Burbank Municipal Court bench. Petitioner introduced testimony by the other judge, C. Bernard Kaufman, that he too would order defendants to appear in court if they did not comply with an order to pay attorney fees to the county (through the court clerk) by a prescribed date. A showing that other judges engaged in an improper practice does not make the practice proper though, as pointed out later, petitioner's knowledge of other judges' practices may be relevant to the issue of bad faith.

of Public Defender fees of $25.00. If fees not paid, then defendant to be cited back into court and new order made." Anderson did not pay or appear, and petitioner continued the matter several times. After petitioner told Van Gelder he was going to issue a bench warrant for Anderson's arrest, Van Gelder personally paid the $25 fee to the clerk on March 3.

Petitioner testified: He called in Van Gelder on January 15, 1980, and confronted Van Gelder with a report petitioner had just received from the clerk that Van Gelder had told the clerk and Anderson that Anderson did not have to pay the attorney fees. Van Gelder said he had told Anderson only that he need not pay the attorney fees at that time. Petitioner reiterated he would not tolerate public defenders telling their clients not to pay ordered fees. He also told Van Gelder: "Now look at what kind of situation you have created here for us at the court: We have an unpaid $25, and we don't have any continuance date. The man isn't ordered to return back." Van Gelder agreed to have Anderson come back to court, by calling or writing him, and petitioner made the docket order continuing the matter to February 6.[3] He did not threaten to raise the fees to $200 or $250.

The making of that threat, however, was convincingly testified to by Van Gelder, who described at length his conversations with petitioner in connection with the *Anderson* matter. We conclude that the commission's findings on the subject are supported by clear and convincing evidence.

Similarities between the *Anderson* incident and other incidents described in the findings illuminate patterns in petitioner's approach to the making and enforcement of fee orders. Thus, there are other instances (*Rueda, De Carolis*) in which petitioner appears to have reacted to unwelcome actions of the public defender by threatening or attempting to increase the amount of attorney fees ordered without regard to redetermination of ability to pay. Apart from threats to raise fees, the *Anderson* incident illustrates two of petitioner's collection practices established by other findings: (1) making sure that fees were paid before petitioner lost power to enforce payment of the fine and (2) using orders to appear in court as a means of enforcing payment of fees.

*Recording Fee Orders as Apparent Condition of Probation*

The commission found: Fee orders were frequently recorded on the form of probation order without notation that the order was not a condition of

---

[3]Petitioner testified that when Van Gelder agreed to ask Anderson to come back to court, petitioner said: "Fine. We'll put it over. You can represent your client." That statement seems inconsistent with the masters' finding that petitioner had "the belief that the Public Defender has no legitimate interest in participating in the civil function of setting or collecting fees."

probation, thus creating the impression that it *was* a condition. Only if a public defender objected did petitioner make exceptions, e.g., by writing "not a condition of probation" on the form.

The exhibits include 10 cases in which petitioner's fee order appears on the probation order under the "Terms of Probation" opposite the space for "Other." These orders were made between June 27, 1979, and July 1, 1980. Petitioner calls to our attention, and we have found, only one exhibit (*Orellana* containing an order dated June 9, 1980) in which petitioner added, "Not a condition of probation" (or its equivalent) after such an entry. On another order (*Rodriguez,* May 20, 1980) petitioner apparently had entered and crossed out the fee order on the probation form, and made an equivalent order on a separate printed form on which boxes could be checked for payment of the fee through the court clerk or, instead, through the county bureau of resources and collections. In that case, petitioner provided for payment through the clerk. In still another case (*Rueda*) it appears that on June 3, 1980, petitioner similarly deleted a fee order on the probation form and made the order on the separate form but checked the box for payment through the county bureau. Three deputy public defenders testified that when petitioner entered the fee order on the probation form, he did not advise the defendant that the fee order was not a condition of probation.

Petitioner conceded in his testimony that payment of attorney fees cannot be made a condition of probation under section 987.8.[4] He testified that he did not write on the probation forms that the fee orders were not conditions of probation because he had discussed the issue with the deputy public defenders and had an understanding with them that a fee order was never to

---

[4]In *In re Allen* (1969) 71 Cal.2d 388 [78 Cal.Rptr. 207, 455 P.2d 143], this court unanimously concluded that a condition of probation requiring that the defendant reimburse the county for the cost of appointed counsel was invalid as an impediment to the right to counsel guaranteed by the Sixth Amendment. But in *Fuller* v. *Oregon* (1974) 417 U.S. 40 [40 L.Ed.2d 642, 94 S.Ct. 2116], a six-member majority of the high court criticized our reasoning in *Allen* as "wide of the constitutional mark" and affirmed a judgment imposing probation conditioned on compliance with a statute requiring convicted defendants to reimburse the state for legal expenses when they are able to do so. Thereafter, in *People* v. *Amor* (1974) 12 Cal.3d 20 [114 Cal.Rptr. 765, 523 P.2d 1173], a decision upholding the validity of an early version of section 987.8, this court acknowledged *Fuller* v. *Oregon,* but instead of deeming *Allen* overruled, distinguished it on the ground, inter alia, that violation of a condition of probation would subject the defendant to imprisonment whereas a fee order under section 987.8 is enforceable only by execution as on a civil judgment. (*Id.,* at p. 25.) Finally, *In re Elizabeth S.* (1982) 138 Cal.App.3d 450, 454 [188 Cal.Rptr. 2] (no pet. for hg.) held that "*Allen* still stands for the proposition that imposing reimbursement as a condition of probation is absolutely prohibited in California courts." In light of *Fuller* v. *Oregon,* the Court of Appeal added: "Presumably the source of this prohibition is the right to counsel guaranteed by section 15 of article I of our state Constitution." (*Id.,* at p. 54, fn. 2 [40 L.Ed.2d at p. 655].) (See Witkin, Cal. Crimes (1983 Supp.) § 1074C; Witkin, Cal. Criminal Procedure (1983 Supp.) § 370C.)

be treated as such a condition. He conceded, however, that many or most defendants, on seeing the fee order entered on the probation form without explanation, would fail to realize that it was not a condition of probation. He testified, in justification, that "we had no other form . . . to hand him [a defendant]," even though, as already explained, the exhibits contain two instances where a separate form was in fact used. (The notation "11-75" at the bottom of that separate fee-order form, which appears designed for all municipal courts in Los Angeles County, seems to indicate that it came into use in November 1975.)

Petitioner presented testimony of two other judicial officers of the same court, Judge Kaufman and Commissioner Murphy, that they too wrote the fee orders opposite "Other" on the form for terms of probation, though Commissioner Murphy added that he crossed out the word "Other." Petitioner correctly points out in his brief that there was no direct evidence that any defendant was in fact misled into thinking that the fee order was a condition of probation. Petitioner also points to the masters' finding in *Rueda* that petitioner "to the knowledge of the Public Defender, had no intention of enforcing the fee order as a condition of probation." But the masters also found that "the unexplained presence of the fee order on the *Rueda* probation order had the potential of leading defendant Rueda to believe that payment of the fee order was a condition of probation."

The commission's finding as to petitioner's recording fee orders in a way that created the impression that they were conditions of probation thus is supported by evidence that is not only clear and convincing but also uncontradicted.

*Extraction of Attorney Fees from Bail Deposits*

The commission found that petitioner's "general practice was to extract from a defendant's posted bail the amount of money needed to satisfy the assessed attorney's fees" "whether or not the defendant requested or consented to same." The findings describe seven cases in which petitioner, between June 4, 1979, and September 22, 1980, ordered attorney fees paid from posted bail. Court records of those cases, confirming the findings, are in evidence.

A deputy public defender testified that petitioner ordered attorney fees taken from posted bail without giving defendants any choice in the matter. He recalled only one instance in which petitioner asked if there were objections to the order; there, the defendant responded by objecting to the amount of the fee. A defendant in one of the cases described in the findings (*Hock*) testified that he was not asked if he objected to application of his bail money

to attorney fees, and that if he had been asked, he would have objected. Petitioner testified that he never ordered bail money applied to attorney fees without the defendant's consent.[5] The masters' and commission's findings to the contrary are supported by clear and convincing evidence.

■ Petitioner now contends, however, that the following sentence in section 1297 authorized him to order bail deposits applied to attorney fees even without the defendant's consent: "If the money [for bail] remains on deposit at the time of a judgment for the payment of a fine, the clerk must, *under the direction of the court,* if the defendant be the depositor, apply the money in satisfaction thereof, and after satisfying the fine *and costs,* must refund the surplus, if any, to the defendant." (Italics added.)[6] Petitioner argues that the "costs" which section 1297 authorizes the clerk to withhold from the refund of a bail deposit include the "cost" of legal assistance which section 987.8 (see fn. 1, *ante*) empowers the court to order the defendant to pay to the county. The provision for "satisfying the fine and costs" has been part of section 1297 since 1872, and we do not think it was intended to refer to costs of legal services, which first became reimbursable to the county a century later under the initial enactment, in 1971, of section 987.8. Nonetheless, petitioner's argument has enough plausibility that if in fact he had relied on it in deducting attorney fees as well as the entire fine from bail deposited by a defendant, the reliance would not have amounted to misconduct.

■ In other respects, however, orders made by petitioner for application of bail deposits to attorney fees were clearly improper in the absence of consent by interested parties. In three cases (*Hock, Chavez, Stephens*) the bail money was applied to the entire amount of the attorney fee but only part of the fine. The defendant was thereby left with a balance of a fine enforceable by criminal sanctions, whereas use of the bail money to pay all the fine would have left simply an attorney fee balance, collectible only in the manner of a civil judgment. Such orders clearly violated section 1297's command that the clerk "must . . . apply the money in satisfaction thereof"

---

[5] Petitioner's reply brief denies he said "never," citing his testimony on direct examination concerning his "normal procedure." The "never" testimony was given in subsequent cross-examination.

[6] Before an amendment that took effect on January 1, 1981, section 1297 provided as follows: "When money has been deposited, a receipt shall be issued in the name of the depositor. If the money remains on deposit at the time of a judgment for the payment of a fine, the clerk must, under the direction of the court, if the defendant be the depositor, apply the money in satisfaction thereof, and after satisfying the fine and costs, must refund the surplus, if any, to the defendant. If the person to whom the receipt for the deposit was issued was not the defendant, the deposit after judgment shall be returned to him within 10 days after he claims it by submitting the receipt, and, if a claim is not made within 10 days of the exoneration of bail, the clerk shall immediately notify the depositor of the exoneration of bail."

(necessarily referring to the fine); only then, after "satisfying the fine and costs," is the surplus to be refunded.

Another type of impropriety is seen in three cases (*Munden, Callaway, Garcia*) in which petitioner ordered attorney fees paid out of bail deposited by persons other than the defendant. Section 1297 provides that bail deposits must be returned to a nondefendant depositor on demand and authorizes no deductions. (See *Rodman* v. *Superior Court* (1939) 13 Cal.2d 262, 267 [89 P.2d 109].) Petitioner's testimony was that he would apply bail money furnished by a nondefendant depositor to attorney fees only with the depositor's consent. But the records of those three cases contain printed forms for "Assignment of Cash Bail Deposit," signed by the depositors, providing only for application of the deposit to a *fine,* not to attorney fees or any other costs.

Disputing the commission's finding that with respect to bail deposits he "usually ordered attorney fees to be paid before fines," petitioner cites two instances in which he imposed fines and ordered attorney fees but required that only the fines be taken out of bail. But even those cases are consistent with petitioner's apparent aim of avoiding, where possible, any situation that would leave a defendant with an obligation to pay attorney fees unaccompanied by any other obligation that could be enforced through criminal sanctions. In one of these cases (*Fernandez*) on January 28, 1980, petitioner ordered a fine and penalty assessment totaling $380 payable as follows: $300 forthwith from bail, with the balance of $80 due on March 10. An attorney's fee of $50, however, was made payable on February 29. In the other case (*Warner*), on Friday, January 11, 1980, petitioner ordered a $250 bail deposit applied to the fine and ordered immediate payment of $100 for legal fees; the latter was paid on Monday, January 14.

Finally, there is no evidence that petitioner relied on any particular legal theory when he made the orders to apply cash bail deposits to attorney fees without the defendant's consent or, where a third party had deposited the bail, the consent of that party. He testified that he always obtained that consent, but giving weight to the masters' resolution of testimonial conflicts and examining the pertinent exhibits, we conclude that during the period in question it was petitioner's practice not to obtain the consent, and that he engaged in that practice without regard to its legal justification.

*Presence and/or Degree of Misconduct in Petitioner's Attorney Fees Collection Practices*

 The commission made a blanket finding that petitioner "engaged in a course of conduct concerning attorney's fees as set out above . . . which

constitutes wilful misconduct in office and conduct prejudicial to the administration of justice that brings the judicial office into disrepute." The conclusion applies to all the findings discussed hereinabove under the headings, "Making Attorney Fees Payable Before Fines," "Ordering Appearances for Fee-Collecting Purposes," "Mervin Anderson Incident," "Recording Fee Orders as Apparent Condition of Probation," and "Extraction of Attorney Fees from Bail Deposits."

The masters, on the other hand, concluded that none of those acts constituted wilful misconduct but that the following acts were conduct prejudicial: "leading defendants to believe that payment of attorney's fees was required as a part of compliance with criminal sanctions imposed" and, in the *Mervin Anderson* case, "threatening to increase another judge's fee order." The masters further concluded that petitioner's "practice in ordering payment of fees first from bail without the consent of the defendant, while legally erroneous," was neither wilful misconduct nor conduct prejudicial.

The masters bolstered those conclusions with additional findings on petitioner's professional standing and activities; these findings may be summarized as follows: Petitioner is an able and experienced municipal court judge, highly respected by the judicial officers of his court. He has become widely known and well respected by the judges of other Los Angeles County Municipal Courts, and has contributed to the efficiency of those courts, through his extensive activities in the Municipal Court Judges' Association of Los Angeles County and in the Presiding Judges' Association, of which he is a founder and has served in all offices. He was particularly involved in a project of the latter association for implementation of section 987.8, and since the county bureau of resources and collections found it uneconomic to attempt collection of fee orders of less than $100, he developed a procedure of ordering smaller fees paid through the clerk of his court for remission to the county. He believes that assessment and collection of fees under section 987.8 is in the public interest and cannot be accomplished "without unremitting and zealous attention by municipal court judges themselves to attempt to collect smaller fee orders, believing that if judges did not see to collections, no one else would."

Petitioner denies any misconduct and contends that even if he made mistakes, they were merely legal errors subject to correction on appeal or in writ proceedings. We disagree.

Though some of the acts in question, such as setting a date for payment of an attorney fee in advance of the date set for payment of a fine in a particular case, would not necessarily constitute misconduct or even legal error when viewed in isolation, they became misconduct as part of petition-

er's larger scheme for using threats of criminal sanctions to collect attorney fees ordered paid to the county. That scheme violated the provisions of section 987.8 that provide for collection of attorney fee orders only by execution as on a judgment in a civil action and prohibit enforcement by contempt.

Central to the scheme was the practice of ordering defendants who failed to pay the fees by a set date to return to court, not because of any doubt about their ability to pay (which presumably had already been determined as a prerequisite to the § 987.8 order) but simply to coerce compliance by questioning them about why they had not yet paid, perhaps suggesting community service as an alternative to payment (a suggestion for which petitioner offers no legal justification), and then setting a new date on which the defendant was ordered either to have paid the fee or to reappear for a new round of interrogation. It was apparent concern over interference with this approach that provoked petitioner's anger at the deputy public defender who told Mervin Anderson that Anderson could pay a fine without simultaneously paying a fee that had been ordered paid on the same day.

The effectiveness of this periodic interrogation as a collection device was enhanced by petitioner's other practices. Making fee orders appear to defendants to be a condition of probation, regardless of petitioner's lack of intention to enforce them as such, necessarily suggested that failure to pay would jeopardize the defendant's probation status. Ordering the fine payable after the fee made sure that until and after the fee was paid, the defendant would remain subject to the court's jurisdiction for purposes of administering the criminal sanctions available to enforce payment of the fine. A similar result was achieved when, in violation of Penal Code section 1297, bail deposits were applied to ordered fees even though a balance remained due on a fine.

We accordingly concur in the commission's conclusion that petitioner's course of conduct described in the findings sustained hereinabove constituted misconduct subject to discipline. We next must decide whether it was wilful misconduct, as determined by the commission, or no more than conduct prejudicial, as determined by the masters.

■ Bad faith is the touchstone for testing whether misconduct committed by a judge while acting in a judicial capacity constitutes wilful misconduct. (*Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d 270, 283-284.) " '[B]ad faith' is quintessentially a concept of specific intent, requiring consciousness of purpose as an antecedent to a judge's acting maliciously or corruptly." (*Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d 778, 796.) When the judge has " 'intentionally com-

mitted acts which he knew or should have known were beyond his lawful power,' [citation], . . . 'bad faith' entails actual malice as the motivation for a judge's acting ultra vires. The requisite intent must exceed mere volition; negligence alone, if not so gross as to call its genuineness into question, falls short of 'bad faith.'" (*Id.* at pp. 795-796.) Even when the acts in question were within the judge's lawful power, they may involve bad faith, and thus constitute wilful misconduct, if "committed for a corrupt purpose, i.e., for any purpose other than the faithful discharge of judicial duties." (*Id.* at p. 796.)[7]

■ Conduct prejudicial, when committed in the course of acting in a judicial capacity, lacks the element of bad faith but must be "prejudicial to the administration of justice" and "[bring] the judicial office into disrepute." (*Id.* at p. 796; Const., art VI, § 18, subd. (c).)[8] "Bring[ing] the judicial office into disrepute" does "not require notoriety, but only that the conduct be 'damaging to the esteem for the judiciary held by members of the public who observed such conduct.' (*McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 534 [116 Cal.Rptr. 260, 526 P.2d 268])." (*Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d 615, 622-623, fn. 4.)

■ We are not persuaded that petitioner's wrongful fee-collecting practices were carried out in bad faith. His interest in recovering county costs of legal representation appears to have originated in requests by Los Angeles County officials to the county's courts to find means of implementing

---

[7]Thus, we reject the argument in the commission's brief that "where a judge intentionally commits an act which he knew or reasonably should have known was beyond his judicial authority, the mere commission of the act under such circumstances constitutes bad faith and is sufficient in and of itself to constitute wilful misconduct." Bad faith requires a malicious or corrupt purpose beyond mere active or constructive knowledge of lack of power. The statements quoted in the brief from *Spruance, supra,* 13 Cal.3d at p. 796 ("'Bad faith' . . . encompasses acts which the judge knew or reasonably should have known were beyond his lawful power") and *Gonzalez* v. *Commission on Judicial Performance* (1983) 33 Cal.3d 359, 369 [188 Cal.Rptr. 880, 657 P.2d 372] ("wilful misconduct . . . embraces intentional conduct that a judge *should have known* was beyond his judicial authority") establish only that acts committed with such active or constructive knowledge *may* be done in bad faith and thus constitute wilful misconduct; it does not follow that any such act, without more, is necessarily one of wilful misconduct.

[8]Article VI, section 18, subdivision (c) of the California Constitution provides: "On recommendation of the Commission on Judicial Performance the Supreme Court may (1) retire a judge for disability that seriously interferes with the performance of the judge's duties and is or is likely to become permanent, and (2) censure or remove a judge for action occurring not more than 6 years prior to the commencement of the judge's current term that constitutes wilful misconduct in office, persistent failure or inability to perform the judge's duties habitual intemperance in the use of intoxicants or drugs, or conduct prejudicial to the administration of justice that brings the judicial office into disrepute. The commission may privately admonish a judge found to have engaged in an improper action or a dereliction of duty, subject to review in the Supreme Court in the manner provided for review of causes decided by a court of appeal."

section 987.8. In seeking such means through his activities in the two judges' associations mentioned in the masters' findings and in his day-to-day handling of misdemeanor matters, we do not doubt that petitioner was endeavoring in good faith to serve the public interest as he saw it. Relevant to his good faith is his perception that other judges were engaged in similar practices.[9]

As already explained, good faith does not preclude a determination of conduct prejudicial. ■ It is true that a judge should not be disciplined

---

[9]Judge Kaufman, who sat on the same court with petitioner, testified that he too (1) ordered defendants either to comply with section 987.8 orders to pay attorney fees by a particular date or to appear in court and (2) entered fee orders opposite "Other" on the written order setting out terms of probation.

Attached to an amicus curiae brief filed by the 2 judges' associations in which petitioner was primarily active (as mentioned in the masters' findings) are declarations of some 55 judges and commissioners of Los Angeles County Municipal Courts, practically identical in substance. Besides deploring the present proceedings, these declarations include the following matter dealing with implementation of section 987.8 in the county's municipal courts:

"That subsequent to the passage of Proposition Number 13, the Los Angeles County Board of Supervisors began to request that the Municipal Court Judges in Los Angeles County make orders pursuant to California Penal Code Section 987.8.

"That the Presiding Judges' Association in approximately 1978 and thereafter took up the matter of P. C. 987.8 Orders at a number of its monthly meetings, and appointed a Committee to study the proper way to make and implement these orders.

"That there were no guidelines provided for implementation of P. C. 987.8, but it was discussed and decided by a majority of the Judges in Los Angeles County that the language of the Statute was sufficiently broad to permit Judges wide discretion in determining the costs of Public Defender services, and the amount, method and manner of payment by the defendants involved.

"That the Statute required the Court to make such an Order, and further stated that the attorney's fees shall be paid to the County: '. . . in the manner in which the *Court believes reasonable* and compatible with the defendant's financial ability. . . .' (Italics added.)

"That Financial statement forms were prepared for defendants to complete prior to requesting the services of the Public Defender.

"That as a result of the Board of Supervisor's request, and of the action by the Presiding Judges' Association, a *County-Wide practice* or method of operation developed which resulted in:

"(1) Attorney's fees being ordered paid in many cases prior to fines, since the fees were smaller than the fines, being $100 or less; and

"(2) Cash bail, if posted by the defendant, or assigned by another person, being ordered to be used to pay attorney's fees, fines and penalty assessments pursuant to P. C. 1297, and in many cases, fees paid before fines because the fees were smaller; and

"(3) A procedure whereby the Judge would make the Order for payment of attorney's fees based upon the costs and ability to pay, relying upon questions asked of each defendant, financial statements on file, if any, and any other factors which bore upon the defendant's financial capability to pay; and

"(4) A procedure for collecting most small fees and fines through the Clerk of the Court, since the Bureau of Resources and Collections would only accept Orders for collection of $100 or more; and

"(5) A general consensus of opinion by Municipal Court Judges in Los Angeles County, that since the Order concerning attorney's fees is civil in nature, that the Public Defender would not be part of said proceeding."

(In one declaration, signed by two judges, paragraph (2), concerning application of cash bail to the attorney's fees and fines, was deleted.)

for mere erroneous determination of legal issues, including questions of limitations on the judicial power, that are subject to reasonable differences of opinion. (See, e.g., *Wenger v. Commission on Judicial Performance, supra,* 29 Cal.3d 615, 646-647, fn. 13.) ■ But, as explained, petitioner engaged in collection practices that were clearly improper or were carried out in order to implement improper collection methods. We accordingly conclude that petitioner committed conduct prejudicial by ordering appearances for fee-collection purposes, causing fee orders to appear to be conditions of probation, ordering fees payable out of posted bail even though part or all of a fine thereby remained unsatisfied, and making fees payable ahead of fines for the purposes of prolonging the availability of sanctions for nonpayment of the fine and creating the impression that such sanctions could also be used for nonpayment of fees.

■ For the guidance of trial courts, we add that ordering payment of section 987.8 fees before payment of the remaining balance on a fine is not necessarily improper if the defendant is not given the impression, through any of the other practices engaged in by petitioner, that payment of the fees may be enforced by criminal sanctions. As previously explained, deduction of section 987.8 fees from cash bail deposits without the depositor's consent is improper under section 1297.

■ There remains for consideration the *Mervin Anderson* incident. The commission included that incident in the course of conduct it concluded was wilful misconduct, while the masters concluded, with respect to the incident, that "threatening to increase another judge's fee order was conduct prejudicial." We conclude that not only the threat, but also the order that Anderson return to court, made for the purpose of implementing collection of the fee, amounted to conduct prejudicial. (See *Roberts v. Commission on Judicial Performance* (1983) 33 Cal.3d 739, 748 [190 Cal.Rptr. 910, 661 P.2d 1064] (threats to counsel held conduct prejudicial).)

SETTING ATTORNEY FEES IN UNREASONABLE AMOUNTS

*Increasing Fee Because of Irritation at Counsel (Rueda)*

■ The commission found: On June 3, 1980, petitioner fixed an attorney fee of $50 for Alejandra Rueda and entered it on the probation order opposite "Other," so that it appeared to be a condition of probation. Though petitioner and Deputy Public Defender Racusin, who represented Rueda, knew that payment of the fee could not be made a condition of probation, Racusin objected to notation of the fee on the probation order because his client might thereby be misled into believing the contrary. Petitioner said he had no other place to write the order except on a separate form for

payment of fees through the county bureau of resources and collections, which did not then accept fee orders of less than $100 for collection. When Racusin maintained his objection, petitioner deleted the fee provision on the probation order and wrote an order for payment of a fee of $100 through the county bureau. The new order was $50 in excess of a reasonable fee. In changing the fee from $50 to $100, petitioner was motivated by irritation at what he believed was Racusin's improper participation in the fee-collecting process.

Petitioner testified: When he entered the $50 attorney fee on the probation order, Racusin (1) contended there should be no fee order at all and (2) requested that any fee order be on a separate form and made payable through the county bureau rather than through the court clerk. Petitioner told him that the bureau would not accept an order for less than $100, but Racusin insisted on a separate form, so petitioner made the new order for $100.

Racusin testified that when he objected to the fee order's being made an apparent condition of probation, petitioner appeared to cross something out and said "it will be $100 in attorney's fees payable through the county." When Racusin asked why the fee was being doubled, petitioner said that "the court never sends a collection to the county of less than $100."

Petitioner's briefs justify his doubling of the fee order as a response to Racusin's insistence that it be entered on a separate form, coupled with the minimum $100 collectible through the county bureau. Yet examination of the *Rueda* fee order reveals that the printed form was designed for making the fee payable either through the county bureau or through the clerk of the court. Indeed, the record includes an order made just two weeks earlier, on May 20, 1980, in another case (*Rodriguez*) in which petitioner used the same printed form to order that an attorney fee of $100 be paid through the court clerk on or before June 20, 1980.

With respect to the excessiveness of the $100 fee order, Rueda's financial statement, in evidence, indicates that she was employed as a maid at Safari Inn; her gross pay was $100 per week and her take-home pay $400 per month; she was single and had a three-year old daughter; her food, clothing and shelter came to $325 a month; her assets were $20 cash. Racusin testified that petitioner asked Rueda no questions about her financial condition before imposing the fee order, and that the financial statement was not filled out until after the order had already been made. In any event, it is clear that petitioner's doubling the fee was not based on any change in his information concerning the defendant's ability to pay or the legal services she had re-

ceived, but was motivated by a desire to get even with the public defender for objecting to the form of the initial order.

The commission concluded that "[t]he act of increasing fees in the *Rueda* case beyond a reasonable level was wilful misconduct in office." The masters concluded that "[t]he act of increasing fees in the *Rueda* case beyond a reasonable level from irritation at the actions of the Public Defender was conduct prejudicial." The masters declined to find wilful misconduct "[b]ecause the act appears to be an isolated incident."

■■■ The fact that an act is an isolated incident does not preclude a determination of wilful misconduct. In fact the *Rueda* incident bears similarities to the *Mervin Anderson* incident and to other instances of overreaching, in petitioner's endeavors to enforce section 987.8 orders, that we have concluded were conduct prejudicial. The situation here is parallel to that in *Gonzalez* v. *Commission on Judicial Performance* (1983) 33 Cal.3d 359, 371 [188 Cal.Rptr. 880, 657 P.2d 372], where we said: "The evidence suggests petitioner refused to hear the motion [for release on his own recognizance] because it was the public defender who had 'opened his mouth' during the judge's questioning of the defendant. Such hostile, arbitrary, and unreasonable conduct jeopardizes the liberty of an indigent defendant for reasons not related to the merits of the case and therefore constitutes wilful misconduct. [Citation.]" Though petitioner's conduct here jeopardized defendant Rueda's property rather than her liberty, his bad faith is exacerbated by his clinging to the excuse that the printed separate form of order could not be used for ordering payment of fees through the court clerk. The exhibits demonstrate the patent falsity of that excuse. ■■■ We conclude that petitioner's act of doubling the fees in *Rueda* because of irritation at the deputy public defender's objections was wilful misconduct.

### Fee Orders in Unreasonable Amounts

The commission found that in the *Hock, Nachtmann,* and *Liscano* cases, petitioner "assessed attorney's fees which were neither reasonable nor compatible with the available evidence as to the defendants' ability to pay." The masters found that in those cases petitioner did not question the defendants to obtain financial information beyond that submitted in the financial statements, or to ascertain the defendant's financial expectancies within the ensuing six months (see § 987.8, subd. (c)(2) [defining "ability to pay"], set out in fn. 1, *ante.*)

In *Hock,* the defendant submitted a financial statement on which "Not" was inserted after "present employment" but it was also indicated that the defendant worked on "commission" as a "memory expert" for the "Mem-

ory Masters Institute." It showed minimal assets. Hock testified he had borrowed the $440 for the cash bail. Petitioner ordered him to pay a total fine of $440, $340 forthwith out of cash bail, and the balance 49 days later. One hundred dollars in attorney fees was ordered paid forthwith out of the bail. Hock testified that at his hearing petitioner did not inquire about the meaning of "commission" or about any other information on his financial statement, did not inquire about the source of his bail deposit or whether he agreed to its being applied to attorney fees, and said nothing about any right to a hearing on the question of attorney fees. There is no merit in petitioner's argument that the ambiguous financial statement plus the fact Hock seemed able to afford bail was sufficient to support the fee order.

In *Nachtmann,* on August 8, 1979, the defendant was ordered to pay a fine of $130 by October 10, and an attorney fee of $50 by September 12. The court file contains no financial statement, though Nachtmann testified he gave the public defender a form dealing with finances. He testified that petitioner asked him no questions about his employment, income, expenses, or debts, or about his financial statement. He testified he was unemployed at the time. Petitioner testified he did not recall the *Nachtmann* hearing, but that he "would have had to have" asked *Nachtmann* about his employment.

The *Liscano* docket sheet shows that on January 21, 1980, Liscano was (1) fined $350, payable $175 by February 29 and $175 by April 14, and (2) ordered to pay an attorney fee of $100 by February 22. His financial statement indicates he was unemployed and had last worked in 1975. He was represented in the case by Deputy Public Defender Jason, who testified as follows: Jason told petitioner that the defendant was not only indigent but "borderline mentally retarded," and so "pretty much" unable to obtain employment. Petitioner inquired into the defendant's property and employment prospects; the defendant said he had no immediate prospects. The defendant also told petitioner he was doing volunteer work at the Center for Developmentally Disabled, as part of his rehabilitation therapy. Petitioner testified that at the hearing the defendant said he was unemployed and not seeking employment because he was doing "volunteer service"; that he was not disabled and was "expecting" to find employment; and that he was living with his parents. It seems clear from all this evidence that the defendant had no reasonable prospects of obtaining employment within the ensuing six months. (See § 987.8, subd. (c)(2)(ii), set out at fn. 1, *ante.*)

We find that in *Hock, Nachtmann,* and *Liscano,* petitioner assessed attorney fees that were unreasonable in light of the evidence available to petitioner as to the defendants' ability to pay. We concur in the conclusions of the commission and the masters that those acts were conduct prejudicial.

## Giving Unsolicited Advice on Case From Which Petitioner Had Been Disqualified

The commission found: In *De Carolis,* on August 27, 1980, and while the defendant was incarcerated, the public defender filed a declaration of prejudice against petitioner under section 170.6 of the Code of Civil Procedure (hereafter section 170.6). On August 29, the superior court granted a writ of habeas corpus that effectively terminated criminal proceedings, leaving for determination only the amount of attorney fees, if any, to be awarded the county under section 987.8 for the public defender's services. Knowing those facts, petitioner on September 2 wrote the following note addressed to Commissioner Murphy, an employee of petitioner's court: "987.8 hearing should be held. Suggested order $500.00 for all PD's work including Petition and Order re Habeas Corpus payable thru Co. Bureau of Collections. PD to have no part in such hearings. MEG." The fee matter was heard not by Commissioner Murphy but by Judge Kaufman, of the same court, on September 5. The docket sheet indicates that he ordered fees of $400. The masters, who made the same findings as the commission in the matter, found that Judge Kaufman was not influenced by petitioner's note. The court file in evidence includes the order remanding the defendant to custody, dated August 26, and signed by petitioner.

Petitioner testified he did not remember having been disqualified before writing the note (which he acknowledged was his handwriting). But the note was on the case file, and the clerk who accepted the section 170.6 declaration for filing said it was his practice to put the original declaration with the case file and to inform the affected judge as soon as possible. The facts found are otherwise undisputed.

The commission and masters concluded that petitioner's writing the note was wrongful in three respects: (1) It created an impression that petitioner was trying to influence the decision of a commissioner who serves at the pleasure of the court. (2) The section 170.6 declaration should have deterred petitioner from advising other judicial officers on how to decide the matter. (3) Apart from the section 170.6 disqualification, a judge should not give unsolicited advice to another judicial officer on how to decide a matter within the latter's discretion; such advice is to be distinguished from communicating factual matters.

We do not agree that petitioner's writing of the note would have been so clearly wrongful as to warrant judicial discipline if there had been no section 170.6 disqualification and the addressee had been a fellow judge rather than

a subordinate judicial officer. Canon 3(A)(4) of the Code of Judicial Conduct states: "A judge should . . ., except as authorized by law, neither initiate nor consider ex parte or other communications concerning a pending or impending proceeding." The commentary to the canon states: "The proscription against communications concerning a proceeding . . . does not preclude a judge from consulting with other judges, or with court personnel whose function is to aid the judge in carrying out his adjudicative responsibilities." Though the word "consulting" was probably intended to refer only to discussion initiated by a judge in connection with his or her own adjudicative responsibilities, we are not aware of any limitation on communication among judges of the same court that is sufficiently clear to warrant labeling unsolicited advice to one judge from another judge who is not disqualified as misconduct.

The disqualification of petitioner under section 170.6, however, rendered the writing of the note an act that he knew or should have known was beyond his authority. ■ Preliminarily, it is clear that the disqualification barred petitioner from himself ordering attorney fees in the matter under section 987.8.

In argument to this court, petitioner disputes that premise, citing *Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d 615, 646. There, the petitioner had asserted in the trial court that despite a section 170.6 disqualification, "an arraignment hearing remained within his power because section 170.6 disqualifies a judge only from trying a case or hearing 'any matter therein which involves a contested issue of law or fact.' That view had at least enough merit to prevent the holding of it from constituting misconduct. (See *Mezzetti* v. *Superior Court* (1979) 94 Cal.App.3d 987 [156 Cal.Rptr. 802] (disqualified judge held authorized to hold settlement conference); *Fraijo* v. *Superior Court* (1973) 34 Cal.App.3d 222 [109 Cal.Rptr. 909] (plea bargain). But see *In re Byron B.* (1979) 98 Cal.App.3d 300 [330] [159 Cal.Rptr. 430] (acceptance of juvenile's admission of guilt); *Lyons* v. *Superior Court* (1977) 73 Cal.App.3d 625, 627 [140 Cal.Rptr. 826] (plea bargain).)" (*Id.,* at p. 647, fn. 13.)

Here, however, it is irrefutable that the setting of an attorney fee under section 987.8 "involves a contested issue of law or fact" within the meaning of section 170.6. Petitioner argues that the section 987.8 hearing was not the same action or proceeding from which he was disqualified because it was a separate civil matter that could be heard only "upon conclusion of the criminal proceedings in the trial court" (§ 987.8, subd. (a)). The con-

tention is meritless: section 987.8 clearly calls for the holding of the fee-setting hearing at the end of, but as part of, the criminal action in which the legal services were rendered, and that was the procedure followed in petitioner's court.

■ Since petitioner was disqualified under section 170.6 from hearing the fee-setting issue, it was highly improper for him to give unsolicited advice to another judicial officer on how to decide it. The right to disqualify a judge, guaranteed by section 170.6 (*McCartney* v. *Commission on Judicial Qualifications, supra,* 12 Cal.3d 512, 531; see *Solberg* v. *Superior Court* (1977) 19 Cal.3d 182, 193 [137 Cal.Rptr. 460, 561 P.2d 1148]), would be undermined and perhaps vitiated if the disqualified judge were permitted to circumvent the disqualification by initiating advice to another judicial officer on how to decide the matter.

There was additional impropriety, apart from petitioner's disqualification under section 170.6, arising from the fact that Commissioner Murphy was not a full-fledged judge but an officer appointed by petitioner's court to perform "subordinate judicial duties" (Const., art. VI, § 22) "under the direction of the judges" (Gov. Code, § 72190). As the judge senior in service of the court's two judges, petitioner alone had the ultimate say on whether to hire or fire the commissioner. (Gov. Code, § 72192.) On the other hand, the commissioner had all the judicial obligations imposed by the California Code of Judicial Conduct and thus was required to discharge his duties impartially and independently. (Cal. Code of Jud. Conduct, canons 1, 2(A), 3(A), "Compliance with the Code of Judicial Conduct" foll. canon 7.) For petitioner, as the judge to whom the commissioner owed his continued tenure in office, to thrust upon the latter unsolicited advice concerning a matter entrusted to the commissioner's impartial judicial determination was bound to create seemingly, if not actually, intolerable interference with the commissioner's impartiality.

The commission concluded that petitioner's writing of the note was wilful misconduct. We agree. The superior court's habeas corpus order, obtained by the deputy public defender who had filed the section 170.6 declaration of prejudice against petitioner, resulted in final termination of the criminal proceeding only three days after petitioner had ordered the defendant incarcerated. Petitioner's pattern of retaliatory conduct in other matters (*Anderson, Rueda*), plus the facts that the note (1) dealt with the merits of a matter in which petitioner was barred from acting in deference to a litigant's right to impartiality and (2) was addressed specifically to a subordinate judicial officer who held his office at petitioner's pleasure, leads us to conclude that petitioner's act of writing the note was "for a corrupt purpose, i.e., for [a] purpose other than the faithful discharge of judicial duties" and thus con-

stituted wilful misconduct. (*Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d 778, 796.)

## AUTHORIZING RELEASE OF CONFISCATED GUNS FOR SALE BY DEFENDANTS

██ The commission found: On four occasions between April 1979 and August 1980, petitioner ordered the Burbank Police Department to release to the purchaser a revolver, pistol, or rifle (gun) that had been purchased from an owner after having been confiscated in connection with the owner's criminal conviction (or, in one case, conviction of the owner's son). Petitioner did not know the details of the negotiations for the sales and participated in the transactions only by signing the orders releasing the guns to the purchaser. Two of the guns were purchased by Gordon Mangel, petitioner's courtroom bailiff and close personal friend. The other two sales were negotiated by Mangel, one to a deputy sheriff and the other to a Burbank police officer, both of whose duties brought them to petitioner's courtroom from time to time. None of the purchasers was a licensed firearms dealer. The court file in each case contains not only the order of release but also the bill of sale.

Section 12028 provides that a firearm used in a crime is, upon conviction, a nuisance and shall be surrendered to the sheriff or chief of police. Subdivision (c) of that section provides that "[t]he officers to whom the weapons are surrendered, except upon the certificate of a judge . . ., or of the district attorney . . ., that the retention thereof is necessary or proper to the ends of justice, may annually, between the 1st and 10th days of July, . . . offer the weapons . . . [considered] to have value with respect to sporting, recreational, or collection purposes, for sale at public auction to [federally licensed gun dealers]." Subdivision (d) provides that if the "weapon is not of the type that can be sold to the public, generally, or is not sold pursuant to subdivision (c)," it shall "be destroyed." Subdivisions (c) and (f) contain provisions for the return of stolen weapons to innocent owners. Section 12030 provides that a law enforcement agency having custody of a firearm subject to destruction may retain it for official use, but the weapon must be destroyed when no longer needed.[10]

---

[10]Following are provisions of sections 12028 and 12030 as in effect during the gun sales in question, i.e., prior to January 1, 1981.

Section 12028 provided: [¶] (a) "The unlawful concealed carrying upon the person or within the vehicle of the carrier of any of the weapons mentioned in Section 653k, 12020, or 12025 is a nuisance.

"(b) A firearm of any nature used in the commission of any misdemeanor as provided in this code or any felony, or an attempt to commit any misdemeanor as provided in this code or any felony, is, upon a conviction of the defendant, a nuisance.

"(c) Any weapon described in subdivision (a), or, upon conviction of defendant, any

Section 1417 provides: "All exhibits which have been introduced or filed in any criminal action or proceeding may be disposed of as provided in this chapter [§§ 1417-1419]." Section 1419 provides that certain kinds of property, including weapons used in the crime, "filed as an exhibit shall be, by order of the trial court, destroyed or sold or otherwise disposed of under the conditions provided in such order."[11] Apparently in response to petitioner's claim that sections 1417 and 1419 authorized the orders in question, the commission found that "[e]ach firearm sold was then in the custody of

---

weapon described in subdivision (b), shall be surrendered to the sheriff of a county or the chief of police or other head of a municipal police department of any city or city and county. The officers to whom the weapons are surrendered, except upon the certificate of a judge of a court of record, or of the district attorney of the county, that the retention thereof is necessary or proper to the ends of justice, may annually, between the 1st and 10th days of July, in each year, offer the weapons, which the officers in charge of them consider to have value with respect to sporting, recreational, or collection purposes, for sale at public auction to persons licensed under federal law to engage in businesses involving any weapon purchased. If any weapon has been stolen and is thereafter recovered from the thief or his transferee, or is used in such a manner as to constitute a nuisance pursuant to subdivision (a) or (b) without the prior knowledge of its lawful owner that it would be so used, it shall not be so offered for sale but shall be restored to the lawful owner, as soon as its use as evidence has been served, upon his identification of the weapon and proof of ownership.

"(d) If, under this section, a weapon is not of the type that can be sold to the public, generally, or is not sold pursuant to subdivision (c) the weapon shall, between the 1st and 10th days of July, next succeeding, be destroyed so that it can no longer be used as such weapon.

"(e) This section shall not apply to any firearm in the possession of the Department of Fish and Game or which was used in the violation of any provision of law, or regulation thereunder, in the Fish and Game Code.

"(f) No stolen weapon shall be sold or destroyed pursuant to subdivisions (c) or (d) unless reasonable notice is given to its lawful owner, if his identity and address can be reasonably ascertained."

The second and succeeding paragraphs of section 12030 provided: "Any law enforcement agency which has custody of any firearms or any parts of any firearms which are subject to destruction as required by this chapter may, in lieu of destroying such weapons, retain and use any of them as may be useful in carrying out the official duties of such agency, or may turn over to the criminalistics laboratory of the Department of Justice or the criminalistics laboratory of a police department, sheriff's office or district attorney's office any such weapons as may be useful in carrying out the official duties of their respective agencies.

"Any firearm or part of any firearm which, rather than being destroyed, is used for official purposes pursuant to this section shall be destroyed by the agency using such weapon when it is no longer needed by the agency for use in carrying out its official duties.

"Any law enforcement agency that retains custody of any firearm pursuant to this section or that destroys a firearm pursuant to Section 12028 shall notify the Department of Justice of such retention or destruction. This notification shall consist of a complete description of each firearm, including the name of the manufacturer or brand name, model, caliber, and serial number."

[11]Section 1419 provides: "The provisions of Section 1418 shall not apply to any dangerous or deadly weapons, narcotic or poison drugs, explosives, or any property of any kind or character whatsoever the possession of which is prohibited by law, used by a defendant in the commission of the crime of which he was convicted, or with which he was armed or which he had upon his person at the time of his arrest.

"Any such property filed as an exhibit shall be, by order of the trial court, destroyed or sold or otherwise disposed of under the conditions provided in such order."

the Burbank Police Department and none were exhibits filed with the court." In each case exhibits were not necessary since the defendant pleaded guilty. There is no merit to petitioner's argument that the guns plausibly could be regarded as "exhibits which have been introduced or filed in any criminal action or proceeding" (§ 1417) simply because the court record included the police report, in which the gun was described, and, in some cases, an order that the gun be confiscated. (*Harty* v. *Superior Court* (1981) 124 Cal.App.3d 745, 748 [177 Cal.Rptr. 477] [decided after the orders here in question; see fn. 13, *post*].) There is no indication that any of the guns left the possession of the police department during the criminal proceeding.

Petitioner testified that he signed firearm release orders of the sort in question six to eight times. The first time he was approached by private counsel who wanted a gun released so that the defendant could pay his fee.[12] Petitioner consulted a deputy city attorney (also a witness before the masters), who advised petitioner that it was proper to authorize the release. He told petitioner he based his advice on (1) having seen private attorneys obtain the release of guns from police departments to satisfy their fees, (2) the "inherent power" of the court, and (3) the provision in section 12028 for a certificate of a judge that "retention" of the gun "is necessary or proper to the ends of justice," from which he inferred that the power to authorize retention included power to authorize transfer to a private party.

Commissioner Murphy, who had served for a year and a half in petitioner's court, testified that although he had never ordered guns released, he believed that release was proper under section 12028. He reasoned that at least one purpose of section 12028 is to get the weapon out of the hands of someone who may be irresponsible, and that a purchase by a peace officer would accomplish that purpose. Municipal Court Judge Plotkin, who was active with petitioner in the Presiding Judges Association, testified that in his opinion the court had discretion to release a gun to the assignee of a defendant, or to return it to the defendant, or to order it destroyed, but he did not recall, during his testimony, the sections providing such discretion.

We perceive no arguable basis for thinking the petitioner's gun sale orders were authorized by section 12028. It declares the gun a nuisance and requires that the sheriff or police chief holding it either (1) sell it at public

---

[12]There is no evidence that the gun transfer orders found by the commission were motivated by any particular interest on the part of petitioner in implementing payment of attorney fees. In two of the cases, the defendants were represented by the public defender, but no order for fees was made under section 987.8. In the other two cases the defendant was represented by private counsel. In one of those cases counsel signed the bill of sale as his client's agent, and in the remaining case the bill of sale was signed by the defendant's father, who owned the gun and identified himself as an "M.D."

auction to a federally licensed gun dealer, unless a judge or the district attorney authorizes its *retention* or (2) destroy it. Section 12030 authorizes the law enforcement agency having custody of the gun to use it for official duties and requires that it be destroyed when not needed for such use. Thus, the gun is confiscated, and its only permissible dispositions are auction sale to a licensed dealer, retention for official use, or destruction. Petitioner's orders flagrantly violated these provisions in two respects: First, they authorized transfer of the gun to a private party for private use. (Though the purchasers were peace officers, no strings were attached to their use or resale of the weapon.) Second, the proceeds of the sales went to the defendants even though the statutes make clear that the gun is confiscated as a nuisance, becomes public property, and is no longer the defendant's to sell.

Petitioner contends that *Harty* v. *Superior Court, supra,* 124 Cal.App.3d 745, demonstrates that the validity of the gun transfer orders was debatable, and that his making them thus constituted legal error, correctable by a higher court, rather than judicial misconduct. *Harty* invalidated a municipal court's order for transfer of a convicted defendant's confiscated gun from the police department that had arrested him to the marshal of the court for use in his official duties; it was held that the marshal was not among the law enforcement officers entitled to possession of a confiscated weapon under sections 12028 and 12030.[13] But even a holding that the marshal's claim in *Harty* was valid would far from justify the present orders authorizing defendants from whom the guns had been supposedly confiscated to receive the proceeds of a private sale for unrestricted use or resale.

Sections 12028 and 12030 would have made petitioner's approval of private sales of confiscated guns highly improper regardless of the identity or relationship of the parties to the transactions. The involvement of courtroom personnel, particularly petitioner's courtroom bailiff and close personal friend, Gordon Mangel, additionally violated petitioner's obligations under canon 2(B) of the California Code of Judicial Conduct, which specifies particular ways in which "a judge should avoid impropriety and the appearance of impropriety in all his activities" (title of canon 2). Canon 2(B) states: "A judge should not allow his family, social, or other relationships to influence his judicial conduct or judgment. He should not lend the prestige of his office to advance the private interests of others; nor should he convey or permit others to convey the impression that they are in a special

---

[13]*Harty* also held that section 1419 (fn. 11, *ante*), referring to "dangerous or deadly weapons," is superseded by section 12028 because the latter makes the more specific references to firearms or concealed weapons. It added: "In any event, section 1419 has no application here because the firearm in question was not 'filed as an exhibit' in the municipal court [where the defendant had pleaded guilty]." (124 Cal.App.3d at p. 748.)

position to influence him. . . ." By approving a series of confiscated-gun sales to, or negotiated by, his bailiff and friend, petitioner was bound to convey the impression that the bailiff had an "inside track" for obtaining the guns' release. Moreover, the bailiff's status as an arm of the court necessarily gave him an enormous bargaining advantage over the gun sellers, who were recently sentenced defendants or the father of such a defendant. (Two of those defendants had been put on probation; a third sentenced to jail; and the fourth sentenced to time already served.)

The commission concluded that petitioner's approval of the gun sales was wilful misconduct. Certainly he knew or reasonably should have known that the sales themselves were illegal under sections 12028 and 12030 and that the circumstances of the sales, particularly the participation of the bailiff, created at least the appearance of impropriety under canon 2(B). As already pointed out, the touchstone of wilful misconduct is bad faith, which requires a malicious or corrupt purpose beyond mere actual or constructive knowledge of lack of power. (*Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d 778, 795-796; *Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d 270, 283-284.) While petitioner's acts of approving the gun sales constituted a grossly negligent misuse of his judicial power, we are not persuaded by clear and convincing evidence that his motives in committing those acts were malicious or corrupt. Accordingly, we conclude that the acts amounted only to conduct prejudicial.

### PROPRIETY OF COMMISSION'S PUBLIC RELEASE OF ITS REPORT WHEN FILING RECORD WITH SUPREME COURT

Petitioner asserts, and the commission's brief tacitly concedes, that on filing the record of commission proceedings in this court, the commission disseminated a press release and copies of its findings, conclusions, and recommendation in this matter. Petitioner contends that such dissemination (1) constituted a public admonishment even though the commission is authorized on its own to issue only *private* admonishments (Const., art. VI, § 18, subd. (c); fn. 8, *ante*) and (2) violated article VI, section 18, subdivision (f) of the Constitution ("The Judicial Council shall make rules . . . providing for confidentiality of proceedings"), which was construed in *Mosk* v. *Superior Court* (1979) 25 Cal.3d 474 [159 Cal.Rptr. 494, 601 P.2d 1030], to require that commission proceedings be confidential, at least while they are under way.

A similar contention was rejected in *Roberts* v. *Commission on Judicial Performance, supra,* 33 Cal.3d 739, 750, primarily in reliance on rule 902(a) of the California Rules of Court, which provides that subject to certain exceptions, commission proceedings "shall be confidential until a

record is filed by the Commission in the Supreme Court."[14] That rule is consistent with the constitutional requirement that the Judicial Council make rules "providing for confidentiality" (art. VI, § 18, subd. (f).) Termination of the *constitutional* ban on public disclosure after the filing of the record in this court is demonstrated by the analysis in *Mosk*, where the court noted "the absence of any indication that the people of California intended to change the constitutional requirement of confidentiality by revision of article VI in 1966" (25 Cal.3d at p. 499) and examined the predecessor provisions of former article VI, section 10b (set out in fn. 14, p. 490 of 25 Cal.3d), which provided that commission proceedings shall be confidential "except that . . . the record filed by the commission in the Supreme Court . . . upon such filing loses its confidential character."

The question presented, therefore, is whether public disclosure should be restricted beyond the point—filing of the commission's record in this court—at which article VI, section 18, subdivision (f) of the Constitution and the applicable Judicial Council rules neither prohibit nor require such disclosure.

The United States Supreme Court has identified three public interests served by rules that require confidentiality in judicial disciplinary matters: (1) protecting complainants and witnesses against recrimination or retaliation, (2) protecting judges from publication of frivolous or unwarranted charges, and (3) maintaining confidence in the courts by avoiding premature disclosure of groundless claims of judicial misconduct. (*Landmark Communications, Inc.* v. *Virginia* (1979) 435 U.S. 829, 835 [56 L.Ed.2d 1, 8, 98 S.Ct. 1535].) Justice Mosk, dissenting in *Roberts* v. *Commission on Judicial Performance, supra,* 33 Cal.3d 739, 751, urged that still another interest—protection of this court's right to decide for itself whether to administer public censure—would be protected by preventing the commission from publicizing its recommendation of censure, together with supporting findings, upon filing them with this court. Offsetting these interests in confidentiality is the policy of promoting knowledgeable discussion of governmental affairs by providing access to all relevant information in the absence of some overriding interest in confidentiality. (See, e.g., *Globe Newspaper Co.* v. *Superior Court* (1982) 457 U.S. 596, 606 [73 L.Ed.2d 248, 256-257, 102 S.Ct. 2613] ["Public scrutiny of a criminal trial enhances the quality and safeguards the integrity of the factfinding process . . . [and]

---

[14]The court in *Roberts* also relied on a statement in *Mosk* v. *Superior Court, supra,* 25 Cal.3d 474, 502, that article VI, section 18, subdivision (f) of the Constitution does not preclude the commission "from publicly announcing the results of an investigation already known to the public." There are indications in the present record and in the judges' association amicus brief filed on petitioner's behalf that the pendency of the commission proceedings was generally known, at least among Los Angeles County municipal judges.

permits the public to participate in and serve as a check upon the judicial process"].)

Of these four factors favoring confidentiality, only one—maintenance of confidence in the courts—warrants even a postponement of public access to the record of commission proceedings once it is filed in this court. By that time all the evidence has been gathered, so that the identity of the witnesses and, probably, of the complainant, has been disclosed to the accused judge. Moreover, the commission has by then satisfied itself that the evidence before it warrants some form of discipline, rendering it highly unlikely that this court will deem the charges wholly unwarranted or frivolous. Protection of the judge's reputation in the event of ultimate exoneration no more necessitates confidentiality after the proceedings reach this court than does protection of the reputation of a lawyer or other professional, whose license to practice has been administratively placed in jeopardy, require confidentiality in judicial review proceedings. Finally, we do not agree that publicizing the commission's findings and recommendation upon the filing of its record here is equivalent to public censure by this court and thus "restrict[s] the options available" to us (*Roberts* v. *Commission on Judicial Performance, supra,* 33 Cal.3d 739, 752 (dis. opn. of Mosk, J.)). If we decide that public censure is unwarranted, we have ample opportunity to provide appropriate exoneration in our explaining that conclusion.

There remains, however, the question whether the commission's publicizing of its findings and recommendation immediately upon filing the record here unnecessarily jeopardizes public confidence in the integrity of a sitting judge and thus in the judicial process. The question does not arise if the commission recommends the judge's removal or retirement. In that event, the judge is immediately "disqualified from acting as a judge" (Const., art. VI, § 18, subd. (a)), and there is a public need to know the reason for that disqualification. But if the recommendation is censure, the judge continues to sit.

The fact that the commission's report to the court is couched not in terms of charges or accusations but in the form of findings of fact and conclusions of law seems apt to create an impression on the public that the findings and conclusions are established fact—an acceptance that will not be dispelled until the proceedings in this court culminate in the filing of an opinion. The intermediate steps, such as the filing of a petition challenging the findings and the presentation of oral argument, are likely to receive considerably less public attention than the act—filing of the commission's report and record—that first brings the matter to full-blown public attention.

When the commission's report and record are filed, the judge has 30 days within which to file a petition seeking rejection or modification by this court

of the commission's recommendation. (Cal. Rules of Court, rule 919(b).) If the commission's report and record were to remain confidential until the filing of a petition, and the contents of the recommendation and findings released to the public simultaneously with release of the petition, there would appear far less probability of the public's accepting as final those findings that were contested in the petition. To that extent there would be more public willingness to suspend judgment concerning the contested findings during the pendency of proceedings in this court and until the filing of our opinion. Erosion of confidence in the judge that was unnecessary and improper because based on findings ultimately rejected by us would be far less likely.

■■■ We think that the public interest in minimizing doubts about the judicial process arising from charges that may not be upheld warrants a postponement of the release to the public of the commission's report and of the record of its proceedings until either a petition for review by this court has been filed or the time for filing such petition has expired. The short additional period of secrecy beyond that mandated by article VI, section 18, subdivision (f) of the Constitution is well worth the offsetting public benefit.

Accordingly, we direct the clerk of this court henceforth, in any case in which the commission has recommended censure but not removal or retirement of a judge, to keep all filed and received documents and exhibits under seal, and to conceal the identity of the judge, until either the judge files a petition for review or the time for such filing has expired. We further recommend to the Judicial Council that it provide by rule (1) that the commission refrain from making its proceedings or recommendation in such a case public during a similar period and (2) that any press release or other publicity calling initial attention to the filing of the report and record make appropriate reference to the petition for review, if any, to the end that the public will perceive that the commission's recommendation and findings are wholly or partly contested by the judge. Finally, pending action by the Judicial Council on that recommendation, we urge the commission to comply with the substance of the recommendation voluntarily. We are aware of nothing in the present Rules of Court, statutes or the Constitution that prevents it from doing so.

## CONCLUSION

Finally, we must decide whether to accept the commission's recommendation of public censure. It is suggested that censure in this case will deter enforcement of section 987.8. In our view, enforcement of section 987.8 *according to its terms* is not only proper but laudable. Petitioner's misconduct arose primarily out of his failure to observe clear guidelines laid down

by the Legislature for the assessment and collection of fees for the public defender's legal services and for the disposition of guns confiscated in connection with crimes. His culpability transcends mere legal error. All of the misconduct established in the foregoing opinion constituted at least conduct prejudicial; some was committed with gross negligence; and some amounted to wilful misconduct. The commission's recommendation of public censure is clearly correct.

Accordingly, and by this order, Judge Gubler is publicly censured.

KAUS, J.—I agree wholeheartedly with the court's disposition of this case. I respectfully dissent, however from that portion of the court's opinion which seeks to regulate the period, after filing of the record in this court, during which commission proceedings recommending public censure shall remain confidential.

Justice Mosk's criticism of current procedures as expressed in *Roberts* was primarily based on the fact that they undermine the availability of private admonishment as a realistic option. Once the proceedings are made public, private admonishment—though deemed by us to be adequate—becomes a farce. I thought Justice Mosk was dead right on that point when I read his dissent in *Roberts* and I still think so. The reason why I did not join him then was threefold: (a) Article VI, section 18, subdivision (f) of the Constitution directs the Judicial Council, not us or the commission, to make rules implementing confidentiality. (b) The basic Judicial Council rule was rule 902(a), of the California Rules of Court which, in effect, provided that confidentiality ceased when the record was filed with us. (For that reason I thought Justice Mosk's criticism of the commission's press release was somewhat unfair: the exceptions to confidentiality set forth in rule 902(b) clearly relate only to releases before the filing of the record: once the record is filed, the proceedings are simply a public document as any other filed with this court.) (c) Even if we were to write the rules, I saw no practical way of "keeping the lid" on commission proceedings, short of maintaining confidentiality at least until we filed our opinion. Today's holding proves my point: assuming, as we must, the possibility of eventual vindication—or private admonishment—it seems naive to believe that the filing of a petition for review by the judge will remove the sting of what may prove to be an unjust accusation or an unjustifiably harsh recommendation for public censure. In the event of complete vindication or private admonishment, nothing but permanent confidentiality will suffice.

I continue to believe that since the Constitution has entrusted the rule-making power to the Judicial Council, we should let it rest there, at least unless we can say that its rules simply do not provide for confidentiality.

(E.g., *Mosk* v. *Superior Court* (1979) 25 Cal.3d 474, 488-499 [159 Cal.Rptr. 494, 601 P.2d 1030].) This does not mean that I do not believe that present rules cannot be improved upon. I do not, however, believe that this decision is an improvement, since it does not go far enough to accomplish its purpose.