**Gregory THOMPSON**

v.

**STATE of Tennessee.**

Supreme Court of Tennessee,
at Nashville.

Assigned on Briefs April 8, 2004.

May 12, 2004.

Michael J. Passino, Nashville, Tennessee, and B. Campbell Smoot, District Public Defender, Fourteenth Judicial District, Tullahoma, Tennessee, for the appellant, Gregory Thompson.

Paul G. Summers, Attorney General and Reporter; Michael Moore, Solicitor General; Jennifer L. Smith, Assistant Attorney General; C. Michael Layne, District Attorney General, Fourteenth Judicial District, for the appellee, State of Tennessee.

## OPINION

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined.

The appellant, death-row inmate Gregory Thompson, challenges the trial court's order denying a hearing on the issue of his competency to be executed. The trial court concluded that Thompson had failed to make a sufficient threshold showing. After carefully considering de novo the petition, the trial court's order, and the entire record in this cause, we conclude that the trial court correctly held that Thompson failed to make a threshold showing sufficient to warrant a hearing on his competence for execution. Accordingly, the judgment of the trial court is affirmed.

## I. Procedural Background

In 1985, a Coffee County jury convicted the appellant, Gregory Thompson, of the first degree murder of Brenda Lane and imposed a sentence of death for this conviction. On direct appeal, this Court affirmed Thompson's conviction and sentence. *See State v. Thompson*, 768 S.W.2d 239 (Tenn.1989). The United States Supreme Court denied Thompson's petition for a writ of certiorari. *See Thompson v. Tennessee*, 497 U.S. 1031, 110 S.Ct. 3288, 111 L.Ed.2d 796 (1990).

Thereafter, Thompson sought post-conviction relief in the state courts, but after a hearing, the trial court denied relief. The Court of Criminal Appeals affirmed the trial court's judgment, and this Court denied Thompson's application for permission to appeal. *See Thompson v. State*, 958 S.W.2d 156 (Tenn.Crim.App.) *perm. app. denied* (Tenn.1997).

In 1998, Thompson filed a petition for writ of habeas corpus in the United States District Court for the Eastern District of Tennessee. The district court granted summary judgment to the State and dismissed the petition. The United States Court of Appeals for the Sixth Circuit affirmed the district court's judgment. *See Thompson v. Bell*, 315 F.3d 566 (6th Cir.2003). On December 1, 2003, the United States Supreme Court again denied Thompson's petition for writ of certiorari and thereafter denied Thompson's petition for rehearing. *See Thompson v. Bell*, ——

U.S. ——, 124 S.Ct. 804, 157 L.Ed.2d 701 (2003), *reh'g denied* —— U.S. ——, 124 S.Ct. 1162, 157 L.Ed.2d 1058 (2004).

On January 21, 2004, one day after the United States Supreme Court denied rehearing, the State filed a motion requesting that this Court schedule Thompson's execution. In response to the motion, Thompson raised the issue of his present competency to be executed and requested a hearing pursuant to *Van Tran v. State,* 6 S.W.3d 257 (Tenn.1999).[1]

On February 25, 2004, this Court set Thompson's execution for August 19, 2004, but also remanded the case to the Coffee County Circuit Court[2] for proceedings in accordance with *Van Tran,* including an initial determination of whether Thompson had made a threshold showing sufficient to warrant an evidentiary hearing on the issue of his present competency to be executed.

On March 1, 2004, Thompson filed a petition in the Circuit Court for Coffee County requesting a competency hearing. Attached to the petition were copies of records showing that, for almost twenty years, Thompson has been treated for mental illnesses. The attached records included reports of mental health professionals opining that Thompson is not presently competent to be executed and affidavits from both Thompson's attorney and investigator in the federal court proceedings. These affidavits describe Thompson's delusional beliefs about his upcoming execution.

The State filed a response to the petition, asserting that Thompson's submissions, even if true, did not create a genuine issue of disputed fact about Thompson's present incompetence for execution and thus did not meet the threshold requirements under *Van Tran* for an evidentiary hearing. On March 8, 2004, the trial court entered an order denying a hearing on the issue and concluding that the expert reports submitted by Thompson demonstrate that he presently is aware both of the fact that he has been sentenced to death for the murder of Brenda Lane and of the fact of his impending execution. Thompson filed an expedited appeal as required by *Van Tran,* 6 S.W.3d at 271–72. After carefully considering the record, we affirm the trial court's judgment dismissing the petition.

## II. Threshold Issues

### A. Public Defender's Motions to Withdraw

■ In the order of February 25, 2004, setting Thompson's execution date and remanding the case to the Coffee County Circuit Court, this Court appointed Michael J. Passino as lead counsel and the Office of the Public Defender for the Fourteenth Judicial District as co-counsel for Thompson. On March 1, 2004, B. Campbell Smoot, the District Public Defender for the Fourteenth Judicial District, filed both in this Court and in the trial court a "Motion to Withdraw as Counsel." As grounds for withdrawal, the motion alleged that the Office's sole investigator, Jimmy Dale Conn, served as a lead investigator with the Coffee County Sheriff's Department during the investigation of Brenda Lane's murder and testified for the prosecution at Thompson's 1985 trial.

---

1. Characterizing Thompson's mental condition as an extenuating circumstance, the response also urged this Court to issue a certificate of commutation to the Governor under Tennessee Code Annotated section 40–27–

106. This Court denied Thompson's request for issuance of a certificate of commutation.

2. Thompson was initially tried and sentenced in the Coffee County Circuit Court.

On March 8, 2004, the trial court denied Thompson's petition for failure to satisfy the threshold showing, but the trial court did not rule on the Public Defender's motion to withdraw. On March 9, 2004, this Court denied the Public Defender's motion to withdraw, stating:

In our view, the motion is not well-taken. Mr. Conn's past involvement in Thompson's prosecution and trial does not disqualify the entire Office of the Public Defender for the Fourteenth Judicial District from proceedings to determine Thompson's discrete claim that he currently is not competent to be executed.

In this appeal Thompson argues that the trial court abused its discretion by failing to decide the motion to withdraw before ruling on Thompson's petition. In addition, Thompson asserts that the Public Defender should have been allowed to withdraw because an appearance of impropriety exists based upon the investigator's past employment with the prosecution during Thompson's original murder trial.

The State does not respond to the merits of Thompson's argument that withdrawal is appropriate. However, the State points out that this issue has been resolved by this Court, "notes with some concern" that the Office of the Attorney General has never been served with a copy of the motion, despite being listed on the certificate of service for the motion filed in the trial court, and states that the Attorney General's Office was unaware of the basis of the motion until entry of this Court's order of March 9, 2004.

In our view, the trial court did not err in ruling upon the petition before deciding the motion to withdraw. Thompson provides no legal authority supporting his assertion that the trial court's decision constituted an abuse of discretion. Given that this Court appointed the Public Defender's

Office, the trial court reasonably may have concluded that this Court should consider and dispose of the motion to withdraw. Furthermore, as the State points out, in light of this Court's order denying the motion to withdraw, Thompson's claim is moot insofar as he suggests that the motion established an appearance of impropriety and that the trial court erred by not granting the motion.

However, our inquiry is not ended. On March 17, 2004, the Public Defender moved this Court to reconsider its order of March 9, 2004, denying his motion to withdraw. This motion asserts that, because one of the three lawyers employed by the Public Defender's Office represented Thompson's co-defendant, Joanne MacNamara, a conflict of interest exists requiring withdrawal of the entire Public Defender's Office. Accordingly, the motion requests that this Court reconsider its March 9 order and allow the Public Defender's Office to withdraw.

We are of the opinion that this motion is not well-taken. The Public Defender's Office has been appointed as co-counsel in a proceeding to determine the discrete issue of Thompson's present competency to be executed. Thompson has completed the standard three-tier appeals process. Issues relating to the validity and correctness of Thompson's conviction and sentence have been litigated in proceedings that are now final. The Public Defender's motion alleges neither a conflict of interest nor an appearance of impropriety requiring withdrawal. *See State v. White,* 114 S.W.3d 469, 476 (Tenn.2003) (discussing conflict of interest and appearance of impropriety). Accordingly, the Public Defender's motion to reconsider is without merit and is denied.

*B. Trial Judge's Recusal in Prior Case*

■ On March 30, 2004, Thompson filed in this Court a "Motion to Vacate Trial

Court Order, or, in the Alternative, Supplemental Brief in Support of Appeal." In this filing, Thompson contends that the order entered by Judge Gerald Ewell, the trial court judge who reviewed and denied Thompson's competency petition, is void because Judge Ewell recused himself from Thompson's post-conviction case. Thompson cites to cases from Tennessee and other jurisdictions holding that a trial judge who recuses himself or herself can take no further action in the case except necessary ministerial acts, such as transferring the case to another judge.[3] Under these authorities, Thompson asserts, any other orders of the recused judge are void and of no effect. Relying upon these authorities, Thompson asks this Court to vacate Judge Ewell's order and remand this case and designate another judge to hear the cause. Thompson asks that this Court appoint Judge Frank Clement, Jr., of the Court of Appeals, as a special judge because Judge Clement presided over Thompson's prior conservatorship proceedings.

On April 2, 2004, the State filed a response to Thompson's motion and/or supplemental brief. While the State does not dispute the proposition that a recusal order disables a judge from further adjudica-tive responsibility in the proceeding in which the order is entered, the State points out that the disqualification does not extend to subsequent independent proceedings unless some disqualifying factor exists in those proceedings as well. Relying upon *Van Tran* and this Court's order denying the Public Defender's motion to withdraw, the State contends that this competency proceeding is an independent action involving a discrete issue, not a continuation of any prior proceedings. *See Van Tran*, 6 S.W.3d at 264 (holding that post-conviction is not the appropriate avenue for litigating the issue of competency to be executed). We agree.

As the State points out, this Court in *Van Tran* instructed that the trial court in which the prisoner's original trial occurred is the proper forum for competency proceedings. 6 S.W.3d at 267. Furthermore, this Court later explained that, "[a] competency proceeding is sui generis...." *Coe v. State*, 17 S.W.3d 193, 214 (Tenn.2000). A competency proceeding is an action independent of the trial and post-conviction proceedings. *Id.* Finally, as the State emphasizes, a claim of ineffective assistance of counsel, the basis for Judge Ewell's recusal in the post-conviction case,[4] does

---

3. Thompson relies upon the following authorities to support this proposition: *El Fenix de Puerto Rico v. The M/Y JOHANNY*, 36 F.3d 136, 142 (1st Cir.1994); *Moody v. Simmons*, 858 F.2d 137, 143 (3d Cir.1988); *Arnold v. Eastern Air Lines, Inc.*, 712 F.2d 899, 904 (4th Cir.1983); *McCuin v. Texas Power & Light Co.*, 714 F.2d 1255, 1260–61 (5th Cir.1983); *In re Cement Antitrust Litigation*, 673 F.2d 1020, 1025 (9th Cir.1982); *Stringer v. United States*, 233 F.2d 947, 948 (9th Cir.1956); *Rohrbach v. AT & T Nassau Metals Corp.*, 915 F.Supp. 712, 716 & n. 5 (M.D.Pa.1996); *Gubler v. Commission on Judicial Performance*, 37 Cal.3d 27, 207 Cal.Rptr. 171, 688 P.2d 551, 567–68 (1984); *Bolt v. Smith*, 594 So.2d 864, 864 (Fla.Dist.Ct.App.1992); *State v. Evans*, 187 Ga.App. 649, 371 S.E.2d 432, 433 (1988), *overruled on other grounds by State v.*

*Smith*, 268 Ga. 75, 485 S.E.2d 491 (1997); *Ferguson v. Pony Express Courier Corp.*, 898 S.W.2d 128, 130 (Mo.Ct.App.1995); *State ex rel. Johnson v. Mehan*, 731 S.W.2d 887, 888 (Mo.Ct.App.1987); *Byrd v. Brown*, 613 S.W.2d 695, 699–700 (Mo.Ct.App.1981); *Pueblo of Laguna v. Cillessen & Son, Inc.*, 101 N.M. 341, 682 P.2d 197, 199 (1984); *State v. Nossaman*, 63 Or.App. 789, 666 P.2d 1351, 1355 (1983), *abrogated on other grounds by Matter of Marriage of Benson*, 141 Or.App. 458, 919 P.2d 496 (1996); *McElwee v. McElwee*, 911 S.W.2d 182, 186 (Tex.App.1995).

4. At Thompson's original trial and in the Rule 12 Report, Judge Ewell commended defense counsel's performance. In the post-conviction proceeding, Thompson filed a successful motion to disqualify Judge Ewell, arguing that

not arise in this competency proceeding. In short, Judge Ewell's recusal in the post-conviction case does not disqualify him from presiding in other separate and independent proceedings involving Thompson, including this competency proceeding. *Cf. State v. Thornton*, 10 S.W.3d 229, 237 (Tenn.Crim.App.1999) (recognizing that a judge is not disqualified from hearing a case because the judge has knowledge of the facts of the case). Thompson's request to vacate the trial court's order and remand for designation of another judge is not well-taken and is denied.

### C. Request for Stay—Inter-American Human Rights Commission

■ On April 2, 2004, Thompson filed a document entitled "Notice of Inter-American Human Rights Commission of the Organization of American States Request of the United States to Take Precautionary Measures to Prevent the State of Tennessee from Carrying out the Execution of Gregory Thompson Presently Scheduled for August 19, 2004 and Request for Stay of Execution." By this document, Thompson requests that this Court issue a stay of his execution based on a petition filed with the Inter-American Commission on Human Rights ("Commission"), asserting that his execution would violate the American Declaration of the Rights and Duties of Man ("Declaration") because of his mental illness and because of alleged "irregularities" in his criminal proceedings.[5] In his

motion to this Court, Thompson asserts that the rules of the Commission allow the United States government two months to respond to his petition, and, assuming the United States government responds at the end of its allotted time, a stay is necessary to allow the Commission sufficient time to examine Thompson's case.

■ As a general rule, international agreements, even those benefitting private parties, do not create rights privately enforceable in domestic courts. *United States v. Emuegbunam*, 268 F.3d 377, 389, 392 (6th Cir.2001) (holding that the Vienna Convention, and in particular Article 36, does not create in a detained foreign national a right of consular access). "In fact, courts presume that the rights created by an international treaty belong to a state and that a private individual cannot enforce them." *Id.* at 389. There are, of course, exceptions to this rule, but an international agreement can be considered to create judicially-enforceable private rights only where such rights are contemplated in the agreement itself. *Garza v. Lappin*, 253 F.3d 918, 924 (7th Cir.2001) (citing *Frolova v. Union of Soviet Socialist Republics*, 761 F.2d 370, 373 (7th Cir. 1985)). The general rule that a treaty creates no rights privately enforceable in domestic courts clearly applies to Thompson's motion.

In 1951, the United States ratified the Charter of the Organization of American

---

his earlier remarks showed that he had "prejudged" the issue of ineffective assistance of counsel. There is no indication that Thompson challenged Judge Ewell's qualification in the trial court in the present case; therefore, the issue could be considered waived. *See Thompson v. State*, 958 S.W.2d 156, 172 (Tenn.Crim.App.), *perm. app. denied* (Tenn. 1997) (stating that the right to an impartial judge may be waived by lack of timely objection). Thompson explains his failure to raise the issue earlier by alleging that he had no formal notice that Judge Ewell had been as-

signed this case until entry of the order he now appeals.

**5.** The State points out that Thompson's petition to the Commission was submitted *ex parte* and that information regarding the petition derives from a letter Ariel Dulitzky directed to attorneys Michael J. Passino and Marjorie Bristol, dated March 31, 2004, noting receipt by the Commission of Thompson's petition.

States ("OAS").[6] This treaty authorized creation of the Commission. *See Garza,* 253 F.3d at 924 (citing OAS Charter (Amended) Article 112, 21 U.S.T. 607). The Declaration, under which Thompson invokes the Commission's authority, creates no judicially cognizable rights for individuals. Rather, it is an aspirational document, imposing no enforceable obligations on any member nation of the Organization of American States. *Garza,* 253 F.3d at 923 (stating that the Declaration is an aspirational document that, in itself, creates no directly enforceable rights). The OAS Charter authorized the creation of the Inter–American Commission on Human Rights, which serves as an autonomous consultive organ to the OAS on human rights matters and a convention to determine the structure, competence, and procedure of the Commission. The resulting American Convention on Human Rights ("American Convention") accomplished that purpose and, as well, created an Inter–American Court of Human Rights, whose decisions are potentially binding on member nations. *Garza,* 253 F.3d at 925. While the United States has signed and ratified the OAS Charter, the United States has *not* ratified the American Convention. *Id.; see also Stanford v. Kentucky,* 492 U.S. 361, 390 n. 10, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (Brennan, J., dissenting) (noting that Article 4(5) of the American Convention on Human Rights has been signed, but not ratified, by the United States).[7] Consequently, the American Convention does not qualify as a "treaty" of the United States and creates neither obligations binding on the United States government nor rights privately enforceable in domestic courts. *See Garza,* 253 F.3d at 925.

Indeed, the Commission's governing document, the Statute of the Inter–American Commission on Human Rights, provides separate procedures for processing complaints against nations that have ratified the Convention and those, like the United States, that have not ratified the Convention. Under the Commission's governing statute, the Commission's authority as to complaints, such as Thompson's, against non-ratifying nations is limited to making *recommendations* for what it might consider more effective observance of human rights. *Id.* As to nations that have ratified the American Convention, the Commission's powers are extended to include action before the Inter–American Court of Human Rights. Under neither circumstance, however, does the Commission's authority as to member nations exceed simply making non-binding recommendations in response to complaints of human rights violations. *Id.* The Commission's request for precautionary measures in response to ·Thompson's petition, then, is simply a "request" which has no binding effect on either the United States government or this Court. *See Garza,* 253 F.3d at 925 (stating that the United States has not obligated itself to be bound by the Commission's decisions); *Roach v. Aiken,* 781 F.2d 379, 380 (4th Cir.1986) (denying a stay of execution where no treaty obligation would require enforcement of a decision of the Commission); *Jamison v. Collins,* 100 F.Supp.2d 647, 766 (S.D.Ohio 2000) (same); *see also Buell v. Mitchell,* 274 F.3d 337 (6th Cir.2001) (stating that the American Declaration of the Rights and Duties of Man is not binding on the

---

**6.** The treaty was ratified by the United States as amended in 1968. *Garza,* 253 F.3d at 924.

**7.** See *http://www.oas.org/main/english/.* for a copy of the OAS, an explanation of the pow-

ers and duties of the Commission, and a list of nations that have ratified the American Convention.

courts of the United States). As the Seventh Circuit recognized, "non-binding recommendations to a government on how to conduct its affairs would appear to be addressed to the executive and legislative branches of the government, not to the courts." *Garza*, 253 F.3d at 926. In short, the Commission's decisions are in no way binding on domestic judicial proceedings. Thompson's motion requesting a stay of execution to allow the Commission time to consider his petition therefore is denied. *See Philip R. Workman v. State*, No. M1999–1334–SC–DPE–PD, Order (Tenn. filed Mar. 29, 2001) (denying death-row inmate's request to stay his execution pending resolution of his petition before the Inter–American Commission on Human Rights); *Workman v. Sundquist*, 135 F.Supp.2d 871, 872 (M.D.Tenn.2001) (concluding that death-row inmate was not entitled to temporary restraining order staying execution where inmate could not show decision of Inter–American Commission is enforceable in courts of the United States).

### III. Competency Petition

■■■ Having resolved these threshold issues, we must next consider whether the trial court erred in concluding that Thompson had failed to make a threshold showing sufficient to warrant a hearing on his competency petition. Under Tennessee law, a prisoner is not competent to be executed if the prisoner lacks the mental capacity to understand the fact of the impending execution and the reason for it. *Van Tran*, 6 S.W.3d at 266. A prisoner is not entitled to a hearing on the issue of competency unless the prisoner makes a threshold showing that a genuine, disputed issue exists regarding the prisoner's present competency. *Id.* at 268; *see also Coe*, 17 S.W.3d at 211. As this Court explained in *Van Tran*, the rationale underlying the threshold requirement is twofold. First, death penalty litigation engenders the po-

tential for false claims and intentional delay. The issue of incompetency is particularly troublesome because this issue can be repeatedly litigated by the same prisoner until the very moment of execution with the prisoner repeatedly claiming the onset of incompetence sometime after the previous determination to the contrary. *See Van Tran*, 6 S.W.3d at 270 (citing *Ford v. Wainwright*, 477 U.S. 399, 429, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (O'Connor, J., concurring in the result in part, dissenting in part)). Second, the prisoner is presumed to be competent because the prisoner is asserting incompetency "following a trial and sentencing hearing at which his sanity was either conceded or determined by the court." *Van Tran*, 6 S.W.3d at 271 n. 15 (quoting *Ford*, 477 U.S. at 426 n. 6, 106 S.Ct. 2595 (Powell, J., concurring)) (citing *State v. Harris*, 114 Wash.2d 419, 789 P.2d 60, 67 (1990); Ariz.Rev.Stat. Ann. § 13–4022(E) (West Supp.1998); Ohio Rev. Code Ann. § 2949.29(c) (Anderson Supp. 1998)).

■■■ Given these compelling rationales, requiring a prisoner to make a substantial threshold showing is both necessary and appropriate. Indeed, as this Court emphasized in *Van Tran*:

> [w]ithout a substantial threshold requirement, the eleventh hour petitions asserting insanity would be encouraged because the death row petitioner would know that the mere filing of a conclusory petition would result in a stay of execution. Placing no initial burden on the petitioner is an invitation to specious insanity claims.

*Van Tran*, 6 S.W.3d at 269 (quoting *Harris*, 789 P.2d at 69). Thus, the prisoner bears the burden of making a threshold showing that a genuine, disputed issue exists regarding the prisoner's present competency.

This burden may be met by the submission of affidavits, depositions, medical reports, or other credible evidence sufficient to demonstrate that there exists a genuine question regarding petitioner's present competency. In most circumstances, the affidavits, depositions, or medical reports attached to the prisoner's petition should be from psychiatrists, psychologists, or other mental health professionals. If the trial court is satisfied there exists a genuine disputed issue regarding the prisoner's present competency, then a hearing should be held.

*Van Tran,* 6 S.W.3d at 269 (citations omitted). Proof sufficient to meet this threshold showing must relate to *present* incompetency; therefore, crucial to this showing is evidence from recent mental evaluations or recent observations of the prisoner. *Id.; see also Coe,* 17 S.W.3d at 212. The threshold is thus not satisfied by evidence of the prisoner's distant past incompetency. *Id.* In addition, unsupported conclusory assertions will be insufficient to satisfy the required threshold showing. *Id.* Allegations that the prisoner is mentally ill are not sufficient to meet the threshold showing requirement. *See Coe,* 17 S.W.3d at 221 (stating that "the existence of a mental disorder does not automatically translate into a finding of incompetency to be executed"). Unless the prisoner submits materials that raise genuine disputed issues about the prisoner's mental capacity to understand or be aware of the fact of the impending execution and the reason for it, the threshold showing has not been met. *Id.* at 220. Furthermore, the prisoner's unusual views about what occurs after the prisoner's execution "are not pertinent to the question of [the prisoner's] competency

because they do not impede [the prisoner's] ability to understand the fact of [the prisoner's] impending execution and the reason for it." *Id.* at 222. Indeed, as this Court and other courts have recognized, "what occurs beyond death is not a subject on which any witness can be qualified as an expert, and every person is free to believe as he or she may wish on that subject." *Id.* at 222.

Finally, this Court will review de novo the trial court's determination that Thompson failed to establish a genuine issue regarding his present competency. The trial court's decision at the threshold showing stage generally involves no factual determinations entitled to deferential review. Unlike *Coe,* the trial court in this case did not observe witnesses and make credibility determinations. Indeed, the trial court in this case reviewed affidavits and other written submissions before determining that Thompson had failed to establish a genuine issue as to his present competency to be executed. Therefore, much like the standard of review applied when reviewing a lower court decision granting summary judgment, the appropriate standard of review in this case is de novo, with no presumption of correctness afforded the trial court's decision. Whether a genuine issue exists is a question of law.[8] *See, e.g., Guy v. Mut. of Omaha Ins. Co.,* 79 S.W.3d 528, 534 (Tenn.2002) (applying de novo review in the summary judgment context). *Cf. Van Tran,* 6 S.W.3d at 272 (stating that procedural issues are reviewed de novo). Likewise, the appropriate standard of appellate review in this context is de novo with no presumption of correctness afforded the trial court's de-

---

8. In the summary judgment context, the movant bears the burden of establishing that a trial is not necessary because no genuine issue of disputed material fact exists. Here, the prisoner bears the burden of establishing that a hearing is necessary because genuine issues of disputed fact exist regarding the prisoner's competency.

termination.[9]

■ Our holding in this regard is a clarification of that portion of *Van Tran* which instructed that, if a trial court determines the prisoner has failed to meet the required threshold showing, "the trial court shall enter an order denying the petition, which shall include written detailed findings of fact and conclusions of law." *Van Tran*, 6 S.W.3d at 269. The trial court need only include detailed findings of fact in the order if the trial court actually makes findings of fact. Where as here the trial court concludes that the prisoner's written submissions fail to meet the threshold showing required for a hearing, findings of fact are not necessary.

Having articulated the governing legal standards, we next must apply those standards to Thompson's petition and supporting documents.

### IV. Thompson's Petition and Supporting Documents

■ To support his claim of incompetence in this case, Thompson attached to his petition eighteen exhibits, consisting of records detailing Thompson's history of mental illness while in custody of the Tennessee Department of Correction for the murder of Brenda Lane; materials regarding the appointment and later termination of a conservator to supervise Thompson's medication; affidavits from Thompson's attorney and investigator in the federal proceedings; and the reports and curricula vitae of three mental health professionals, who have examined Thompson within the last three months and opine that he is incompetent to be executed.

Many of the exhibits, particularly the records relating Thompson's history of mental illness, are stale and thus not relevant to the issue of *present* competency. *See Van Tran*, 6 S.W.3d at 269. Nevertheless, Thompson asserts that these records reflect delusional beliefs about his personal identity ("he is God and in control of the world" and "he is a wealthy songwriter"), about the State's ability to carry out his death sentence ("he believes, despite his death sentence, that he will be released from prison ... because Big Bird or God

9. Our conclusion that de novo review is the appropriate standard should not be viewed as an acceptance of Thompson's assertion that the trial court's order "does not reflect independent judicial judgment." Thompson's claim that the trial court improperly delegated its obligation to make findings of fact and conclusions of law to the State, thereby depriving him of procedural due process and a neutral and independent adjudication, is based largely upon the following statement in the order: "In this case many of the assertions made by the State in response to said petition came to the mind of the undersigned while reading the petition, and the State's response generally enunciates the opinion and findings of this Court." Thompson equates this remark with the disfavored procedure of a trial court having counsel for the prevailing party prepare the court's order or findings of fact and further argues that because the trial court improperly "adopted" the State's response, this Court should review the case de novo and not afford a presumption of correctness to the trial court's findings. In our view, Thompson's claim that the trial court's order "does not reflect independent judicial judgment" is belied by the very statement on which he relies. The fact that, while reading the petition, the trial court reached the same conclusions as the positions advanced by the State and ultimately ruled adversely to Thompson provides no basis for a determination of judicial bias or lack of independent judicial judgment. *See, e.g., Alley v. State*, 882 S.W.2d 810, 821 (Tenn.Crim.App. 1994) (stating that a ruling adverse to a party's interest is not sufficient to establish judicial bias). While the order is brief, it is clear that the trial court independently reached its decision and drafted the order. Though we have concluded that de novo review is the appropriate standard in the context of this case, we reject Thompson's charge that the trial court failed to exercise independent judicial judgment. This claim is without merit.

is on his side") and/or the likelihood that his execution will occur ("he will be released from prison ... simply because that is what is going to happen"), and demonstrate that he lacks the mental capacity to be executed. We disagree.

Approximately eight months ago, at the request of Thompson's current counsel, the Davidson County Probate Court terminated a conservatorship for Thompson that had been in place since March 2001. In terminating the conservatorship, then Probate Court Judge Frank G. Clement, Jr., found that Thompson has some insight into his mental illness, that he voluntarily takes his medication, and that he is not in need of the supervision or assistance of a conservator.[10] Judge Clement stated as follows at the conclusion of the termination hearing:

> [I]n the two plus years that Frank Freemon has been conservator—I'm extremely pleased that he was there, but he's basically been unnecessary, which is pretty compelling in itself.... I'm impressed with the fact that, as Mr. Freemon indicated today, they hand him [Thompson] his meds ... and he takes them voluntarily. With that in mind, I believe the conservator is unnecessary.

Moreover, review of the exhibits that are prison records relating to Thompson's mental health history illustrates that Thompson remains aware that he has been sentenced to death for the murder of Brenda Lane. For example, on September 24, 1998, Thompson was interviewed by a prison psychiatrist. During the interview, Thompson recounted that he had seen a

psychiatrist while in the Navy. According to the prison psychiatrist, "Mr. Thompson [said] 'the psychiatrist he saw in the military should have done more tests and *he would not have ended up on death row.*'" (Emphasis added.) According to a prison nurse, Thompson claimed, on January 20, 2001, that an officer at the prison "is actually a woman he is suppose [sic] to have murdered. That she is that person, right age, right build, right hair 'not many people have black-red hair.' Inmate relates that since she is alive and working here *he could not have murdered her and he should not be on death row for something he didn't do.*" (Emphasis added.) Again, on September 6, 2002, Thompson questioned a prison psychiatrist, "I'd like to know when I'm getting out of here." When the psychiatrist asked, "How long is your sentence Greg?" Thompson answered, *"Death."* (Emphasis added.) Contrary to Thompson's assertions, therefore, records from the conservatorship proceeding and from the prison do not establish a genuine issue of disputed fact regarding his competency to be executed.

Thompson also submitted the reports of three mental health experts who opined that he presently is not competent to be executed. Although all of these reports indicate that Thompson is suffering from mental illness, described as schizophrenia, chronic undifferentiated type, the reports do not present facts indicating that Thompson is unaware of his impending execution and the reason for it. In fact, as the State points out, parts of these reports support the opposite conclusion, that

---

**10.** Incompetence is not the standard for appointment of a conservator under Tennessee law. In March 2001, Thompson was found to be "disabled" within the meaning of Tennessee Code Annotated section 34–1–101(7) and in need of the protection and assistance of a conservator. A "disabled person" is defined by the conservatorship statute as "any person

eighteen (18) years of age or older determined by the court to be in need of partial or full supervision, protection and assistance by reason of mental illness, physical illness or injury, developmental disability or other mental or physical incapacity." Tenn.Code Ann. § 34–1–101(7) (2001).

Thompson presently meets the standard of competency for execution.

Although each of the experts ultimately opines that Thompson is presently incompetent to be executed, these opinions, standing alone with no underlying factual bases, are not sufficient to give rise to a genuine issue regarding Thompson's present competency. Significantly, the reports of all three experts either explicitly, or as part of the factual bases underlying their opinions, illustrate that Thompson presently is aware of the fact of his impending execution for the murder of Brenda Lane.

In a report dated January 28, 2004, Dr. John S. Rabun, a psychiatrist, states that, when questioned about the reason for his incarceration, Thompson "readily admitted that he 'killed Brenda Lane.'" Thompson further discussed his trial in Coffee County with Dr. Rabun, stating that he had been convicted of first-degree murder and, during the "second phase," had been sentenced to "death." Dr. Rabun includes in his report four factors that suggest Thompson is competent to be executed:

(1) Mr. Thompson told the examiner that executions in Tennessee are by "lethal injection or the electric chair," suggesting that he understands how the death penalty is carried out;

(2) Mr. Thompson told the examiner that he was convicted in 1985 of killing the victim of the instant matter, suggesting that he understands the reason for his death sentence;

(3) Mr. Thompson told the examiner that he received the death penalty during the "second phase" of his trial, suggesting that he understands the penalty he received; and

(4) Although Mr. Thompson did not know anything about the current appeal process in his case, he said that he knew the State of Tennessee was seeking to execute him.

Dr. Rabun's ultimate opinion of incompetence is based upon Thompson's alleged delusional beliefs about: (1) his personal status and identity;[11] (2) the State's ability to carry out the death sentence;[12] (3) the likelihood that the sentence will actually be carried out;[13] and, (4) what will happen to him upon execution.[14] This Court previously rejected a prisoner's reliance on such delusional or unorthodox beliefs as irrelevant to the question of competency for execution. *Coe*, 17 S.W.3d at

---

11. According to Dr. Rabun's report Thompson believes he: "is actually a 'lieutenant' in the navy"; buried "one million dollars, two gold bars, one Grammy award, and two stock certificates from Quaker State and Apple Computers near a church in Georgia"; and "made up the Klingons so that young people would have a strong black person in TV."

12. According to Dr. Rabun's report, Thompson believes that even though the murder happened within the State of Tennessee, he is "federal property" due to his "officer" status in the Navy, and the State cannot execute him.

13. According to Dr. Rabun's report, Thompson believes that his military record with the "Secretary of the Navy" as a "lieutenant" will allow for a "mistrial" and that he will be "discharged" and can return to live in Ha-

waii. Dr. Rabun also commented that Thompson holds "magical, near child-like reasoning about possible avenues of appeal in the present case."

14. According to Dr. Rabun, Thompson believes he is a Klingon and that his soul will go to Valhalla. Klingons are fictional warrior aliens who appear on the "Star Trek" television series and movies. *See* http://www.startrek.com/startrek/view/library/aliens/article/70638.html (last visited May 10, 2004). The Merriam–Webster Online Dictionary defines Valhalla as "the great hall in Norse mythology where the souls of heroes slain in battle are received." *See http://www.m-w.com/cgi-bin/dictionary?va=Valhalla* (last visited May 10, 2004).

220–22 (declining to overturn the trial court's decision finding Coe competent despite Coe's belief that at his execution he would be in another place in the same body, would visit his ex-wife and child, and would perhaps temporarily be a ball of fire that speaks to people).

Moreover, Dr. Rabun's report, recounting the substance of an interview with Thompson as recently as January 19, 2004, clearly demonstrates Thompson's awareness of the details of the murder of Brenda Lane, the trial and sentencing proceedings resulting in his current death sentence, and further, that he accepts full responsibility for his actions. The report states as follows:

> *Committing Offense:* Mr. Thompson was questioned about the reason for his incarceration. Mr. Thompson readily admitted that he "killed Brenda Lane." He noted that he and a female friend had an "idea" to go to Tennessee. He was then living in Georgia, estimating that he returned to Georgia in 1984. He told the examiner that he and his female friend drove to Tennessee, and he kidnapped "Brenda Lane" who worked at a "Methodist newspaper." He again reported that he "killed Brenda Lane." In other words, he accepted responsibility for his actions. At no point in either interview with the examiner did he try and claim he was innocent or allege that another party committed the offense. Subsequently, he discussed his trial in Coffee County, Tennessee. He indicated that he was convicted of "First Degree Murder" and during the "second phase" was sentenced to "death."

In short, Dr. Rabun's report fails to satisfy the threshold showing for a hearing on competency. Indeed, its detailed description of Thompson's awareness of the murder of Brenda Lane, his sentence of death, and his impending execution, under-cuts, rather than supports, his claim of incompetence. *See Coe,* 17 S.W.3d at 221–222 ("The appellant's comments asserting his innocence and contending that the purpose of his execution is to prevent the truth from coming out actually demonstrate that he understands the fact of his impending execution and the reason for it."); *Cf. Schornhorst ex rel. Fleenor v. Anderson,* 77 F.Supp.2d 944, 955 (S.D.Ind. 1999) (stating that the prisoner considered his execution unfair, but finding that the prisoner had failed to make a threshold showing of incompetency).

The next report is that of Dr. George W. Woods, Jr., a psychiatrist, who evaluated Thompson on February 17, 2004, for three hours. In a report dated February 27, 2004, Dr. Woods diagnoses Thompson as suffering from schizophrenia, undifferentiated type, and opines that Thompson is "currently incompetent to be executed." Dr. Woods reported that Thompson suffers from bizarre delusions and perceptual disorders such as auditory hallucinations and that Thompson believes he cannot die and will stay alive for two years even if he is executed. Thompson also told Dr. Woods that, once it is acknowledged that he is a lieutenant in the Navy, he will receive a trial before a military tribunal and be exonerated. According to Dr. Woods, Thompson also claims that he has a fortune in gold bullion buried in his hometown in Georgia, denies that he will die from electrocution, and says that he has been electrocuted before and plans to go either to "Gangster's Paradise" or to Hawaii after his death. Dr. Woods concluded that, although not mentally retarded, Thompson's mental state is analogous to that of mental retardation and that the same reasons given by the United States Supreme Court in *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), to explain why execution of the

mentally retarded is unconstitutional, apply equally to Thompson. Although Dr. Woods relates Thompson's delusional beliefs, his report fails to address directly the critical inquiry under *Van Tran*—whether Thompson is aware of the fact of his impending execution and the reason for it.[15] To the contrary, Dr. Woods's report indicates that Thompson is aware of the fact of his impending execution and the reason for it. For example, the report states:

> Mr. Thompson believes that he can not die, and there will be a two year period in which he will stay alive, even if he were *executed.* He also believes *that he will not be executed* since he was a lieutenant in the navy, and once this information is acknowledged, *his current conviction* will be thrown out and he will receive a military tribunal which will exonerate him. Thompson further relates that *the electric chair is his method of choice.*

(Emphasis added.) Again, Thompson's beliefs about what will occur after his death or dissatisfaction with his conviction and sentence do not raise genuine issues regarding his competency for execution unless those beliefs preclude Thompson from being aware of the fact of his impending execution and the reason for it. Dr. Woods's report fails to illustrate that Thompson's beliefs pose such an impediment and therefore fails to establish a genuine issue under *Van Tran* regarding Thompson's present competency.

The third report was provided by Dr. Faye E. Sultan, a psychologist, who examined Thompson on January 28, 2004. Dr. Sultan stated that "in a non-medicated state, Mr. Thompson is floridly psychotic" and unaware of his surroundings. Dr. Sultan opined that Thompson is not competent to be executed "in a non-medicated state." Currently, however, as Dr. Sultan acknowledges, Thompson participates in a regular regimen of medications. Dr. Sultan admits that Thompson knows he has been sentenced to death, but she points out that Thompson holds the delusional beliefs that it is impossible for him to be executed or for the execution to occur. Thompson instead talks about leaving prison and returning to Hawaii or to his family.

At best, Dr. Sultan's affidavit establishes that Thompson may become incompetent at some point in the future if he deviates from his current medication regimen, an allegation that has been rejected by this Court on more than one occasion as insufficient to trigger competency proceedings under *Van Tran. See Coe,* 17 S.W.3d at 221 n. 5 (stating that the issue in a *Van Tran* proceeding is the prisoner's present competency to be executed); *see also Abu–Ali Abdur'Rahman v. State,* No. M1988–00026–SC–DPE–PD, Order (Tenn. filed Jan. 15, 2002) (stating that allegations of future incompetency are insufficient to delay execution date or obtain hearing on competency to be executed); *State v. Sedley Alley,* No. M1991–00019–SC–DPE–DD, Order (Tenn. filed Jan. 16, 2004) (finding allegation that prisoner will become incompetent at or around the time of execution insufficient to trigger *Van Tran* proceedings). Thus, like the reports of Dr. Rabun and Dr. Woods, Dr. Sultan's report is insufficient to raise a genuine issue regarding Thompson's present competency to be executed. The expert reports indicate, rather, that Thompson is aware of the fact of his impending execution and the reason for it.

---

**15.** Dr. Woods's report fails to set forth any definition or guiding authority that indicates his opinion is based upon the appropriate legal standard for competence under Tennessee law.

The final exhibits attached to Thompson's petition are affidavits of Dana C. Hansen Chavis, an attorney with the Federal Defenders Services of Eastern Tennessee, Incorporated, ("Federal Defender Services"), who has represented Thompson in the past,[16] and Michael R. Chavis, an investigator with Federal Defender Services. These affidavits recount conversations Dana C. Hansen Chavis and Michael R. Chavis had with Thompson on January 22, 2004, and February 27, 2004, respectively. The affidavit of Dana C. Hansen Chavis relates that, when she advised Thompson the State had filed a motion to set his execution date, Thompson responded: "Don't worry. God told me yesterday I'm not going to die.... I'm either going to Hawaii or I'm going back home." Michael R. Chavis's affidavit relates that when he informed Thompson that his execution date had been set by the order of February 25, 2004, Thompson replied: "It's more important than ever that you find my money and uniform." Both Dana C. Hansen Chavis and Michael Chavis opined that Thompson currently is not competent to be executed.

While Thompson's petition and supporting exhibits establish that he is mentally ill, these filings do not raise a genuine issue regarding Thompson's competency. In fact, the petition and supporting exhibits undercut Thompson's claim that he currently is not competent to be executed. Under *Van Tran* and *Coe*, Thompson need only understand or be aware of the *fact* of his impending execution and the *reason* for

it. *Van Tran*, 6 S.W.3d at 266; *Coe* 17 S.W.3d at 220 (emphasis added). The reports of Thompson's mental health experts show that, despite any delusions, Thompson understands that he is going to be executed for murdering Brenda Lane. As previously stated, the fact that a prisoner may suffer from a mental disease or disorder does not automatically equate to a finding of incompetency to be executed. *Coe*, 17 S.W.3d at 221. Furthermore, while Thompson professes unorthodox beliefs about what will happen *after* his execution, these beliefs do not vitiate Thompson's awareness of the fact of his execution and the reason for it. As previously stated, a prisoner's delusional or unorthodox beliefs about what may occur upon death or the prisoner's irrational beliefs about the legal processes and/or the ability of the State to carry out the execution are not pertinent to the question of competency because they do not impede the prisoner's ability to understand the *fact* of the impending execution and the *reason* for it. *See Coe*, 17 S.W.3d at 221–22 (citing *Weeks v. Jones*, 100 F.3d 124, 125 n. 3 (11th Cir.1996) (finding that the prisoner's belief that he would be transformed into a giant tortoise upon his death and rule the universe did not render him incompetent to be executed); *Garrett v. Collins*, 951 F.2d 57, 58 (5th Cir.1992) (finding the prisoner competent to be executed despite his belief that his deceased aunt would save him through supernatural intervention)). The trial court did not err in concluding that

---

**16.** The State asserts in its response that, by offering personal testimony on a contested issue, Dana C. Hansen Chavis has disqualified herself and Federal Defender Services from representing Thompson in this matter. The State also says that the Federal Defender Services should be disqualified because its appearance in this proceeding exceeds the scope of its authority under federal law. The State points out that no federal proceedings are

presently pending under which a federal judge could authorize Federal Defender Services to represent Thompson in ancillary state-court matters. We need not address these assertions, however, because this Court did not appoint Dana C. Hansen Chavis to represent Thompson in these proceedings but instead appointed Michael Passino and the Public Defender for the Fourteenth Judicial District.

Thompson failed to meet the threshold showing for an evidentiary hearing by establishing that there are genuine issues regarding his present competency to be executed.

Furthermore, Thompson's assertion that the trial court misapplied the law in making its determination is without merit. Thompson points to the trial court's reference to the "high threshold" for obtaining an evidentiary hearing, which he says conflicts with *Van Tran's* simple "threshold showing." Relying upon this language, Thompson claims that the trial court imposed a higher burden than contemplated by *Van Tran*. However, we are convinced that the trial court applied the proper standard in denying Thompson's request for a hearing. Moreover, this Court certainly has applied the proper standard in reviewing de novo Thompson's petition and supporting exhibits and reaches the same conclusion, that Thompson failed to make the required threshold showing. This issue therefore is without merit.

Thompson also argues that the trial court applied an incorrect standard for competence by omitting the "mental capacity component" of *Van Tran*. He contends that the appropriate standard for competence requires that a prisoner have both a rational and factual understanding of the punishment he is about to suffer and the reason for it. According to Thompson, "the prisoner must understand that he will die in the near future (and what it means to die), and that the reason the State will kill him is to punish him for what he did." In addition, Thompson faults the trial court for not applying the "more rigorous" common law assistance standard for competence articulated in *Jordan v. State*, 124 Tenn. 81, 135 S.W. 327 (1911), and argues that this Court should hold that a prisoner is not competent to be executed unless the prisoner is "aware of the penalty and its

purpose [and possesses the ability] to assist in his or her own defense."

Initially we note that this Court expressly rejected the more stringent *Jordan* assistance test as the standard for competency to be executed, observing that neither the Eighth Amendment to the United States Constitution nor precedent of this Court requires the stricter standard. *Van Tran*, 6 S.W.3d at 266 ("We agree with Justice Powell that in a proceeding to determine competency to be executed, only those who are unaware of the punishment they are about to suffer and the reason they are to suffer it are entitled to a reprieve").

Moreover, in *Coe*, this Court refused to engraft upon the term "awareness," a highly technical meaning. Pointing to the prisoner's delusional beliefs about what would happen at the moment of his death ("he will just simply be in another place in the same body, will visit his ex-wife and child" and "when he is given the needle . . . he will then be out of prison and he will be walking around"), Coe argued that, although he had an "awareness" of his impending execution, he lacked an "understanding" of it. *Coe*, 17 S.W.3d at 219–20. This Court instructed, however, that for purposes of determining competency, the terms "awareness" and "understanding" should be given their ordinary, common meanings, not the technical meanings these words may have in the field of psychology or psychiatry. Thus, we concluded that the requirements of *Van Tran* were satisfied because the record clearly reflected Coe "knows that he was sentenced to death for murdering a young girl." *Coe*, 17 S.W.3d at 221. Simply put, a prisoner need only be aware of "the *fact* of his or her impending execution and the *reason* for it" to satisfy the competency required for execution of the death sentence. *Id.* at 220 (emphasis added). The

trial court and this Court on de novo review have properly applied this standard in concluding that Thompson failed to establish a genuine issue regarding his competency and in denying his petition without a hearing.

## V. Conclusion

For all these reasons, and after fully considering the entire record in this cause, the trial court's judgment dismissing Thompson's petition is affirmed. This opinion is not subject to rehearing under Tennessee Rule of Appellate Procedure 39, and the Clerk is directed to certify this opinion as final and immediately issue the mandate. As provided by this Court's order of February 25, 2004, the Warden of the Riverbend Maximum Security Institution, or his designee, shall carry out the appellant's execution in accordance with Tennessee law on the 19th day of August, 2004, unless a stay is entered by this Court or by a federal court.[17] Counsel for Gregory Thompson shall provide to the Office of the Appellate Court Clerk in Nashville a copy of any order of stay. The Clerk shall expeditiously furnish a copy of any stay order to the Warden of the Riverbend Maximum Security Institution.

ADOLPHO A. BIRCH, JR., filed a separate concurring and dissenting opinion.

ADOLPHO A. BIRCH, JR., J., concurring and dissenting.

I concur in Sections I and II of the majority opinion. I dissent, however, from the majority's conclusion that the petitioner has failed to make a threshold showing sufficient to warrant a hearing on his competence for execution.

In *Van Tran v. State*, 6 S.W.3d 257 (Tenn.1999), this Court adopted a "cognitive test," for determining competency for execution, and held that under Tennessee law a prisoner is not competent to be executed "if the prisoner lacks the mental capacity to understand the fact of the impending execution and the reason for it." *Id.* at 266. *Van Tran* established a procedure whereby a prisoner alleging incompetency to be executed was required to make a "threshold showing" in the trial court where he was convicted "that his or her competency to be executed is genuinely in issue." *Id.* at 268. The Court explained what was meant by "threshold showing" as follows:

> [W]e adopt a rule that places the burden on the prisoner to make a threshold showing that he or she is presently incompetent. This burden may be met by the submission of affidavits, depositions, medical reports, or other credible evidence sufficient to demonstrate that there exists a genuine question regarding petitioner's present competency. In most circumstances, the affidavits, depositions, or medical reports attached to the prisoner's petition should be from psychiatrists, psychologists, or other mental health professionals. If the trial court is satisfied there exists a genuine disputed issue regarding the prisoner's present competency, then a hearing should be held.

*Id.* at 269 (citations omitted). The purpose of this threshold requirement is to avoid conclusory petitions and specious claims of incompetency made solely for the purposes of delaying execution. *Id.* at 268–69.

In this case, counsel for the petitioner submitted voluminous evidence of mental

---

17. The State contends that this Court should reconsider its prior order setting Thompson's execution for August 19, 2004, and re-set Thompson's execution to the earliest possible date. The State argues that reconsideration is justified because of the risk of re-litigation of the issue of competency and the potential for false claims and intentional delay. We decline to grant reconsideration.

illness dating back at least eighteen years.[1] Furthermore, three highly qualified experts—two psychiatrists and one psychologist—submitted affidavits in support of the petition for a hearing on competency. All three opined that the petitioner suffered from severe, ongoing schizophrenia, and currently "lacks the mental capacity to understand the fact of the impending execution and the reason for it." *Report of Dr. John S. Rabun, M.D.*, p. 14 (January 28, 2004).[2]

In light of the foregoing evidence in the record, I disagree with the majority's conclusion that there is no "genuine, disputed issue" in this case to meet the threshold requirement. The majority cites to *Coe v. State,* 17 S.W.3d 193 (Tenn.2000), for the proposition that mental illness alone is insufficient to meet the threshold requirement. In that case, however, prior to this Court's conclusion that Coe was competent to be executed, Coe actually had the benefit of a full competency hearing, where the facts of his mental status were thoroughly explored. Thus, I find *Coe* distinguishable. In my mind, there is a difference between requiring a "threshold showing" and requiring conclusive proof, as the majority seems to require here. Accordingly, I respectfully dissent. I would remand to the trial court for a full hearing on the issue of competency to be executed.

---

1. At one point, the petitioner's condition was so severe that, *on motion of the State Attorney General,* the Chancery Court for the Twentieth Judicial District appointed a conservator to make decisions regarding the petitioner's mental health and medical treatment.

2. Likewise, Dr. Faye E. Sultan opined, "Mr. Thompson currently lacks the capacity to understand the fact of his scheduled execution or the reason for it." *Report of Dr. Faye E. Sultan, Ph.D.*, p. 3 (February 27, 2004). Dr. George W. Woods stated "Mr. Thompson remains so grossly psychotic that only the most superficial interrogation would not only reveal his profound psychosis, but his current incompetency [to be executed]." *Report of Dr. George W. Woods, M.D.*, p. 2 (February 27, 2004).